# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

ZAVOLTA v. LORD, ABBETT & CO.    )
LLC et al.                                 )
                                     )   Civil Action No. 08-cv-04546-WJM-MF
                                     )
                                     )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CLASS ACTION COMPLAINT

Jeffrey B. Maletta
Nicholas G. Terris
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20005-1600
(202) 778-9100

Christopher A. Barbarisi
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ  07102
(973) 848-4000

*Counsel for Defendants Lord, Abbett & Co. LLC and Lord Abbett Distributor, LLC*

Dated:  April 6, 2009

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1):
ZAVOLTA LACKS STANDING ............................................................. 6

    A.    Additional Facts Relevant to Standing .............................................. 7

    B.    Zavolta Lacks Standing ................................................................. 9

        1.    Zavolta Was Not the Purchaser of any Lord Abbett Shares .... 9

        2.    The Foreign Traffic Retirement Plan (not Zavolta) Made
            the Only Relevant Investment Decision................................... 11

        3.    The Foreign Traffic Retirement Plan Does Not Have
            Standing to Raise the Claim Asserted in the Complaint.......... 12

        4.    Zavolta Does Not Allege that She Consulted a Broker or
            Intended to Participate in the 401(k) Plan Long Enough to
            Be Among the "Long Term" Investors Allegedly Damaged
            by Defendants' Conduct........................................................... 13

ARGUMENT IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6):  THE COMPLAINT FAILS
TO STATE A CLAIM ........................................................................... 15

I.    MOST OF THE COMPLAINT MIRRORS A PLEADING DISMISSED
    BY THE SIXTH CIRCUIT IN BENZON................................................. 15

    A.    Benzon and this Case Involve Substantially Similar Complaints ...... 15

    B.    Benzon, Ulferts, and Other Authorities Demonstrate that
        there are no Actionable Omissions in the Prospectus ....................... 17

        1.    The Supposed "Failure" to Disclose Relative Account
            Value is Not Actionable .......................................................... 17

i

a.      Lord Abbett Had no Duty to Disclose Relative
        Account Values, which are Immaterial in Light of
        the Information Already Included in the Prospectus ..... 18

b.      Plaintiff's Attacks on Tables and Other
        Disclosures Mandated by or Consistent with
        Form N-1A Should Be Rejected .................................... 22

2.      Lord Abbett's alleged failure to disclose relative
        profitability of Class A shares or broker-dealer
        compensation is not actionable ............................... 25

3.      As in <u>Benzon</u>, there is no Basis for "Scheme" Liability .......... 27

II.     PLAINTIFF FAILS TO PLEAD MATERIALITY WITH RESPECT TO
        HER ALLEGATIONS THAT THE INVESTMENT PERFORMANCE
        TABLES DO NOT REFLECT THAT CLASS B SHARES CONVERT
        INTO CLASS A SHARES AFTER EIGHT YEARS .................................. 28

III.    THE COMPLAINT FAILS TO PLEAD SCIENTER .................................. 32

A.      The Complaint's Affirmative Allegations Do Not Create a
        Strong Inference of Scienter ................................ 33

B.      The Complaint's Scienter Allegations Are Based on Improper
        Group Pleading ................................................... 36

C.      Other Indisputable Facts Undermine any Possible Inference
        of Scienter ...................................................... 38

CONCLUSION ................................................................. 40

# TABLE OF CITATIONS

## FEDERAL CASES

In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999) ........................ 34

Allen v. Wright, 468 U.S. 737, 752 (1984) ............................................................. 13

Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) ............................................. 28

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965-66 (2007) ....................... 29

Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d 598
(6th Cir. 2005) .......................................................................................... passim

In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 246 (8th Cir. 2008) ...................... 40

In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993) ............ 28

In re Eaton Vance Corp. Sec. Litig., 206 F. Supp. 2d 142, 153-54
(D. Mass. 2002) ............................................................................................... 35

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976) ........................... 32

Glazer Capital Mgmt. v. Magistiri, 549 F.3d 744-45 (9th Cir. 2008) .................... 38

Graden v. Conexant Sys., Inc., 496 F.3d 291, 295-96 (3d Cir. 2007) .................... 11

GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004) .... 6, 35

Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.,
530 U.S. 238, 250 (2000) ................................................................................. 10

Int'l Assoc. of Fire Fighters v. Clayton, 320 F.3d 849
(8th Cir. 2003) ................................................................................................. 10

LaRue v. DeWolff, Boberg & Assocs., 128 S. Ct. 1020, 1022 (2008) ............... 9, 10

Lewis v. Casey, 518 U.S. 343, 357 (1996) .............................................................. 6

Ley v. Visteon Corp., 543 F.3d 801, 813 (6th Cir. 2008) ................................. 26, 34

Longman v. Food Lion, Inc., 197 F.3d 675, 684-85 (4th Cir. 1999) ...................... 31

In re Lord Abbett Mut. Fund Fee Litig., 407 F. Supp. 2d 616, 623-24
    (D.N.J. 2005).................................................................... 6

Lusardi v. Xerox Corp., 975 F.2d 964, 974 (3d Cir. 1992) .................................... 40

Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008).. 38

McCann v. Newman Irrevocable Trust, 458 F.3d 281, 290-91 (3d Cir. 2006) ...... 7

McLean v. Alexander, 599 F.2d 1190, 1197-98 (3d Cir. 1979) ............................. 33

In re Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005) .......................... passim

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
    272 F. Supp. 2d 243, 248-49 (S.D.N.Y.) 2003)............................................ 19

Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208,
    2006 WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006) .................................... 40

In re Morgan Stanley Tech. Fund Sec. Litig., 2009 WL 256005 at *8
    (S.D.N.Y. Feb. 2, 2009) ............................................................ 19

Murray v. U.S. Bank Trust Nat'l Assoc., 365 F.3d 1284, 1288 & n.7,
    1292-93 (11th Cir. 2004) ............................................................ 10

In re NAHC Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) ........................ passim

O'Shea v. Littleton, 414 U.S. 488, 494 (1974) ...................................... 13

Pennsylvania Prison Soc. v. Cortes, 508 F.3d 156, 161-62 (3d Cir. 2007) ........... 7

Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.,
    698 F.2d 320, 326 (7th Cir. 1983) ................................................. 10

Phillips v. LCI Int'l, Inc., 190 F.3d 609, 616 (4th Cir. 1999)................................. 31

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) ................. 34

Siemers v. Wells Fargo & Co., No. 05-04518 (WHA), 2006 WL 2355411
    (N.D. Cal. Aug. 14, 2006)........................................................... 27

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,
    365 F.3d, 353, 366 (5th Cir. 2004) ............................................. 6, 37

Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,
    128 S. Ct. 2531, 2542-44 (2008) .................................................................. 11

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
    531 F.3d 190, 195-96 (2d Cir. 2008) ............................................................. 38

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007) ..passim

Ulferts v. Franklin Res., Inc., 554 F. Supp. 2d 568, 575-76
    (D.N.J. 2008)........................................................................................... passim

Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007) ................... passim

Valley Forge Christian College v. Americans United for Separation of Church
    and State, Inc., 454 U.S. 464, 472 (1982)....................................................... 13

W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,
    549 F.3d 100, 110-11 (2d Cir. 2008) ......................................................10, 11

White v. Melton, 757 F. Supp. 267, 269 (S.D.N.Y. 1991) ..................................... 26

## FEDERAL STATUTES AND RULES

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat.
737(1995)…………………………………………………………………….. passim

Fed. R. Civ. P. 8(a), 12(b)(6), 9(b).................................................................. 3, 15

Fed. R. Civ. P. 12(b)(1) .......................................................................................... 2

15 U.S.C. § 78u-4(a)(2).......................................................................................... 7

29 U.S.C. § 1002(34) .............................................................................................. 9

## REGULATORY RELEASES AND OTHER MATERIALS

Consolidated Disclosure of Mutual Fund Expenses, Securities Act Release
    No. 6752, Investment Company Act Release No. 16244 (Feb. 1, 1988),
    53 Fed. Reg. 3192, 3195 (Feb. 4, 1988) ....................................................... 20

Enhanced Disclosure and New Prospectus Delivery Option for Registered
    Open-End Management Investment Companies, Release No. 33-8998
    (Jan. 13, 2009), 74 FR 4546 (Jan. 26, 2009) ................................................. 18

Exemption for Open-End Management Investment Companies Issuing
    Multiple Classes of Shares; Disclosure by Multiple Class and Master
    Feeder Funds; Voting on Distribution Plans, Securities Act Release
    No. 7143, Investment Company Act Release No. 20915 (Feb. 23, 1995),
    60 Fed. Reg. 11876 (Mar. 2, 1995)....................................................... 20, 21

Financial Industry Regulatory Authority ("FINRA") Conduct Rule 2310(a) ........ 20

Lewis D. Lowenfels & Alan R. Bromberg, Suitability in Securities
    Transactions, 54 Bus. Law. 1557 (1999)....................................................... 20

"NASD Settles Cases Against MML Investors Services, NYLIFE Securities,
    Securities America and Northwestern Mutual Investment Services for
    Fines Totaling Over $1.2 Million for Failures Relating to Mutual Fund
    Sales," NASD Press Release (June 28, 2007) ............................................... 21

Registration Form Used by Open-End Management Investment Companies,
    Securities Act Release Nos. 33-7512, 34-39748, 63 Fed. Reg. 13916,
    13917 (March 23, 1998) ............................................................................ 19

Restatement (Second) Agency §§ 268, 275 (1958)……………………………37

Restatement (Third) Agency § 5.03 (2006)……………………………………..37

Restatement of Trusts (Second) §§ 198-199, 214, 280-82 (1959)......................... 11

Scott and Ascher on Trusts § 16.7 (5th ed. 2007) at 1069..................................... 9

Defendants Lord, Abbett & Co. LLC ("Lord Abbett"), the investment adviser to the Lord Abbett family of mutual funds, and Lord Abbett Distributor, LLC ("LAD"), the funds' principal underwriter, respectfully submit this Memorandum in Support of their Motion to Dismiss the Class Action Complaint ("Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Plaintiff Rosemarie Zavolta asserts a securities fraud claim under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. She purports to represent a class of investors who purchased Class A shares of various Lord Abbett mutual funds in an aggregate amount totaling less than $50,000 and who paid a front-end sales load of 5.75%. Compl. ¶¶ 1, 87.

Like other mutual fund families, the Lord Abbett funds offer several classes of shares, including Classes A, B, and C. Compl. ¶¶ 2, 25. In general, Class A shareholders pay a front-end sales load in an amount up to 5.75%, but with breakpoints reducing the sales load for investments over $50,000. Compl. ¶ 27. By contrast, Class B and C shareholders pay no front-end sales load, but their shares are subject to contingent deferred sales charges and/or higher ongoing Rule 12b-1 distribution fees. Compl. ¶ 28. Class B shares convert to Class A shares after an investor has held them for 8 years. Compl. ¶ 75.

Plaintiff's core contention is that, "as a matter of mathematical fact," purchasing Class A shares (rather than Class B or C shares) never maximizes the investment return for shareholders investing less than $50,000 and paying the maximum 5.75% sales charge, Compl. ¶ 21; but in order to increase their own profits, defendants duped investors into purchasing Class A shares by means of misleading statements and omissions in the Funds' prospectuses regarding both the relative merits of the share classes and the incentives of financial intermediaries to sell them.  Compl. ¶¶ 5, 99, 104, 107.

**<u>Plaintiff Lacks Standing</u>**

As a threshold matter, the action must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).  It is clear that lead and sole named plaintiff Zavolta lacks Article III standing to bring the lawsuit for at least four reasons:

1.     Zavolta was not a direct investor in any Lord Abbett funds but is merely a <u>former</u> participant in a 401(k) retirement plan.  The plan, not Zavolta, was the legal owner of the Lord Abbett fund shares, and only the retirement plan or the plan trustee has standing to bring the claim alleged in Zavolta's Complaint.

2.     It was the 401(k) plan, not Zavolta, that decided to invest in Class A as opposed to some other class of shares, and Zavolta thus cannot even be regarded as having made the relevant investment decision.

2

3.      Because the 401(k) plan has invested more than $50,000 in Lord Abbett funds, it qualifies for reduced sales loads and is thus outside the putative class defined by the Complaint.

4.      Even setting aside all of these insurmountable difficulties and treating Zavolta as the relevant investor, Zavolta does not allege that she intended to continue participating in the 401(k) plan long enough to bring herself within the class of long-term investors she purports to represent; and, notwithstanding her allegations about inadequate disclosures of incentives to broker-dealers, she does not allege that she consulted with a broker about the Lord Abbett funds.

### **Plaintiff Fails to State a Claim**

Assuming Zavolta were a plaintiff with standing to bring this lawsuit, the Complaint must be dismissed pursuant to Fed. R. Civ. P. 8(a), 12(b)(6), 9(b), and the controlling strict standards of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) ("Reform Act").

Plaintiff alleges that the Funds' prospectuses violate Section 10(b) in three principal respects.   First, echoing the plaintiffs in Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d 598 (6th Cir. 2005), Zavolta contends that the Funds' prospectuses are misleading in that they omit the following information:

- The prospectuses do not include information about relative account values – the projected future amount an investment would be worth under certain assumptions.  Compl. ¶¶ 39-60.  Zavolta alleges that, in the absence of this information, the prospectuses' fee tables and

3

expense examples misleadingly imply that "the share class with the lowest represented expenses – the class A share – ... equate[s] to higher account values, or higher returns." Compl. ¶ 49.

- The prospectuses omit disclosure of compensation paid to broker-dealers that sell the Funds' shares to investors. Zavolta alleges that such compensation gave the broker-dealers a financial incentive to sell Class A shares over other share classes. Compl. ¶¶ 33-35, 61-71.

As explained in <u>Benzon</u>, which rejected substantially similar allegations and which this Court adopted as persuasive authority in <u>Ulferts v. Franklin Res., Inc.</u>, 554 F. Supp. 2d 568, 575-76 (D.N.J. 2008), these supposed "omissions" are not actionable. The SEC's Form N-1A, which amounts to a comprehensive regulatory regime governing mutual fund disclosures, prescribes the form of much of the information in the prospectus, including the "fee table" and the "expense example." Yet Form N-1A does not require the additional disclosures plaintiff desires. In fact, the SEC considered and rejected the possibility of some such disclosures, which would neither be material nor even necessarily helpful. Abundant relevant information is already included in Form N-1A. And the Form's primary purpose is to furnish relatively succinct information enabling investors to compare different funds – not to provide highly detailed and individualized information regarding the relative merits of a share class for a particular investor or a particular broker-dealer's financial incentives. It is an investor's broker-dealer who has the obligation to recommend to her an appropriate share class and adequately to disclose relevant broker-dealer conflicts of interests.

4

Plaintiff additionally contends that:

- The investment performance tables in the prospectuses fail to reflect that class B shares convert into class A shares after eight years, thereby falsely implying that, after a ten-year holding period, class A shares would have higher cumulative returns and account values than B shares.  Compl. ¶¶ 72-78.

Any error in this regard is immaterial.  The Lord Abbett fund prospectuses and statements of additional information ("SAIs") expressly and clearly indicate that Class A shares generally are not the best share class for investors intending to hold for the long term and to invest less than $50,000.  In light of these disclosures, it is implausible to suggest that the alleged error in the investment performance tables significantly altered the total mix of information available to the investor and her financial adviser.  See, e.g., In re NAHC Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).  Indeed, using only publicly available information, a newspaper reporter was readily able to perceive the error, thus underscoring its immateriality.  See In re Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005).

Finally, with respect to all of the alleged misstatements and omissions, plaintiff falls far short of meeting the difficult burden of alleging facts that create a strong inference of scienter as required by the Reform Act.  Zavolta attempts to plead scienter by alleging generally that the defendant companies had a financial motive to issue misleading statements regarding the relative merits of Class A and B shares.  She makes no effort to plead that any individual acted with a culpable

state of mind.  Similar "motive" allegations have been repeatedly rejected.  See,

e.g., GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004).

Zavolta's generalized averments are particularly inadequate in light of the rule of

law that scienter allegations ordinarily must relate to the state of mind of individual

company officials who make misleading statements – and not to a company as a

whole.  See, e.g., Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d

353, 366 (5th Cir. 2004).  Any inference that the alleged error in the investment

performance tables was fraudulent is not nearly as compelling as a nonculpable

inference of mistake given the aforementioned disclosures clearly indicating that

Class A shares generally were not the best choice for investors in the putative

class.

## ARGUMENT IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1): ZAVOLTA LACKS STANDING

Absent a plaintiff with Article III standing, a federal court lacks subject

matter jurisdiction to adjudicate the merits of a claim.  See In re Lord Abbett Mut.

Fund Fee Litig., 407 F. Supp. 2d 616, 623-24 (D.N.J. 2005).  "[T]hat a suit may be

a class action ... adds nothing to the question of standing."  Lewis v. Casey, 518

U.S. 343, 357 (1996) (citation and internal quotation marks omitted).  To the extent

that the facts set forth below in Section A might be regarded as supplementing or

contradicting the allegations of the Complaint, defendants respectfully apprise the

Court that they raise a factual challenge to plaintiff's Article III standing, and hence to the Court's jurisdiction.[1]

### A.   Additional Facts Relevant to Standing

The Complaint does not allege that plaintiff Zavolta herself purchased Class A shares of any Lord Abbett fund, but indicates only that Zavolta was a participant in a 401(k) plan established by her employer, which in turn invested in Lord Abbett funds.[2]  Zavolta no longer participates in the retirement plan.  She received a final distribution from the plan in or about December 2007.  See Declaration of John K. Forst (the "Declaration" or "Decl.") ¶ 4.

The decision to invest in Class A (as opposed to some other class) of Lord Abbett fund shares was made in or about June 2004 by the trustee of the 401(k) plan in which Zavolta formerly participated.  See Decl. ¶ 6.  Zavolta's only choice as a participant in the plan was to select among Class A shares of a menu of Lord Abbett funds made available by the plan.  See Decl. ¶ 7.

---

[1]    See McCann v. Newman Irrevocable Trust, 458 F.3d 281, 290-91 (3d Cir. 2006) (if defendant contests any jurisdictional allegations, court must permit plaintiff to respond with rebuttal evidence in support of jurisdiction, and court then decides jurisdictional issues by weighing evidence).  Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.  See Pennsylvania Prison Soc. v. Cortes, 508 F.3d 156, 161-62 (3d Cir. 2007).

[2]    See Certification of Representative Plaintiff Pursuant to 15 U.S.C. § 78u-4(a)(2) (attached to Complaint) (detailing transactions in Lord Abbett funds by Foreign Traffic Inc. employee retirement plan in which plaintiff Zavolta was a participant).

The Complaint alleges that, for those who invest less than $50,000, Class A shares were never the best choice but that defendants fraudulently deceived the putative class into believing otherwise.  See, e.g., Compl. ¶¶ 1-5.

It appears to be undisputed, however, that Class A shares are often or ordinarily the best choice for those who intend to invest over $50,000.  This is because, while a 5.75% sales load applies to investments of less than $50,000, purchasers benefit from reduced sales loads when their aggregate investments total more than $50,000.  See Decl. ¶ 8.  Accordingly, the Complaint expressly limits the putative class to persons "who, during the Class Period, purchased class A shares in any one or more of the Lord Abbett funds in an aggregate amount totaling less than $50,000 and paid a sales load of 5.75%."  Compl. ¶ 87.

It is the size of the entire 401(k) plan (rather than the size of an individual participant's beneficial interest) that counts for purposes of calculating whether the $50,000 threshold has been met.  See Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 22, Decl. Ex. 1.  Further, in determining whether the $50,000 threshold has been met, prior purchases are taken into account.  Id.

The Foreign Traffic Inc. employee retirement plan in which plaintiff Zavolta formerly participated currently has over $50,000 in assets invested in Lord Abbett Eligible Funds.  See Decl. ¶ 10.  Consequently, the plan already has benefited from sales charges lower than 5.75%, and presumably will continue to do so.  See Decl.

¶ 10.  Thus, the plan trustee chose what is likely the most cost-efficient available share class based upon the employer's long-term investment horizon and plan investments of more than $50,000.   See Decl. ¶ 10.

### B.    Zavolta Lacks Standing

#### 1.    Zavolta Was Not the Purchaser of Any Lord Abbett Shares

401(k) plans such as the plan in which Zavolta participated are a species of defined contribution plans governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").   See LaRue v. DeWolff, Boberg & Assocs., 128 S. Ct. 1020, 1022 (2008).  In contrast to defined benefit plans, ERISA requires the assets of defined contribution plans to be allocated for bookkeeping purposes to individual accounts within the plan for the beneficial interest of the participants, whose benefits in turn depend on the allocated amounts.   See 29 U.S.C. § 1002(34).   Notwithstanding such participant-level bookkeeping, as with other types of ERISA plans, 401(k) plan assets are held in trust and legally owned by the plan trustee.[3]   Accordingly, when addressing the contours of various remedies

---

[3]      See 29 U.S.C. § 1103(a); LaRue v. DeWolff, Boberg & Assocs., 128 S. Ct. 1020, 1029 (2008) ("The allocation of a plan's assets to individual accounts for bookkeeping purposes does not change the fact that all the assets in the plan remain plan assets.") (concurring opinion).  In a 401(k) plan, a plan participant typically also has the ability to direct the assets in her participant level account into one or more investment vehicles that the plan trustee selected for inclusion in the plan.  This is entirely consistent with the status of the plan assets as trust assets. See generally 3 Scott and Ascher on Trusts § 16.7 (5th ed. 2007) at 1069.

available to ERISA-regulated plans, courts often seek guidance from the common law of trusts.[4]

As the foregoing indicates, the alleged injury in this case was to plan assets – not to any assets Zavolta owned personally – and any legal claim based on any such injury belongs to the plan rather than to Zavolta, and must be enforced by the plan or plan trustee.  Zavolta thus lacks standing to pursue the claim on an individual basis.[5]

It is unnecessary and inappropriate to consider the issue of potential derivative standing given that Zavolta has not even attempted to assert the claim derivatively on behalf of the 401(k) plan in which she formerly participated.[6]

---

[4]    See, e.g., LaRue v. DeWolff, Boberg & Assocs., 128 S. Ct. 1020, 1024 n.4 (2008); Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 250 (2000).

[5]    See, e.g., Murray v. U.S. Bank Trust Nat'l Assoc., 365 F.3d 1284, 1288 & n.7, 1292-93 (11th Cir. 2004) (affirming dismissal of trust beneficiaries' putative class claims against third party tortfeasors for lack of Article III standing; trustee was the only party with standing to bring suit against such third parties); Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co., 698 F.2d 320, 326 (7th Cir. 1983).

[6]    See Int'l Assoc. of Fire Fighters v. Clayton, 320 F.3d 849 (8th Cir. 2003) (dismissing for lack of Article III standing a case brought by beneficiaries of pension plan trust against non-trustee defendants; only the pension plan could possibly sue the defendants and plaintiffs made no effort to plead the suit as a derivative action involving the plan or its trustees); W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 110-11 (2d Cir. 2008) (similar).

In any event, there appears to be no colorable basis for Zavolta to assert a derivative claim on behalf of the retirement plan in which she formerly participated.  This is not a case where the plan trustee is alleged to have breached its duty and injured the retirement plan.[7]  This is instead a case under Section 10(b) and Rule 10b-5 where two third party defendants who are not trustees are alleged to have injured the plan. In these circumstances, and subject to limited exceptions not alleged to be applicable here, it is only the trustee who has the ability to bring suit.  See generally Restatement of Trusts (Second) §§ 280-82 (1959).

### 2.    The Foreign Traffic Retirement Plan (Not Zavolta) Made the Only Relevant Investment Decision

As noted above in Section A, moreover, it was the plan trustee, not Zavolta, who made the only investment decision that is potentially relevant in this case – selecting Class A shares of various Lord Abbett funds as opposed to other share classes of those same funds.  Thus, even assuming (incorrectly in defendants' view)[8] that the making of an investment decision could somehow compensate for

---

[7]    In such cases, both common law courts and federal courts applying ERISA (which has effectively codified trust law principles in this respect) recognize the ability of plan participants or trust beneficiaries to sue the trustee or other fiduciary to recover the loss on behalf of the plan.  See Graden v. Conexant Sys., Inc., 496 F.3d 291, 295-96 (3d Cir. 2007); Restatement of Trusts (Second) §§ 198-99, 214 (1959).

[8]    Cf. W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008) (applying Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 128 S. Ct. 2531, 2542-44 (2008) and dismissing for lack of Article III standing case

plaintiff's lack of legal ownership of the plan assets, Zavolta would nonetheless lack standing because she had no ability to direct the assets in her participant level account into non-Class A shares of any Lord Abbett fund.

### 3. The Foreign Traffic Retirement Plan Does Not Have Standing to Raise the Claim Asserted in the Complaint

Even if Zavolta could step into the shoes of the retirement plan, it would still be necessary to dismiss the case because the plan itself lacks Article III standing.

As already noted, the Complaint's theory is that it was economically irrational for shareholders who invested less than $50,000 in the aggregate, and hence did not qualify for a reduced sales load, to invest in Class A shares but that such shareholders nonetheless did so because the relevant fund prospectuses deceptively stated or implied that Class A shares were their best choice. As detailed above in Section A, however, whatever the merits of this claim, the retirement plan in which Zavolta formerly participated is not in a position to assert it. The plan has reached the $50,000 investment threshold within approximately four years of the plan's inception and thus can be expected to benefit from the reduced sales load.

---

brought by investment adviser derivatively on behalf of investment adviser's client; investment adviser lacked standing even though the adviser "was not only an 'attorney-in-fact [for its client] but also an investment advisor with unfettered discretion to make investment decisions," id. at 105).

"Art[icle] III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982) (citation and internal quotation marks omitted).[9]   The retirement plan in which Zavolta formerly participated is manifestly incapable of making this showing, and the Complaint therefore must be dismissed.

> **4.    Zavolta Does Not Allege that She Consulted a Broker or Intended to Participate in the 401(k) Plan Long Enough to Be Among the "Long-Term Investors" Allegedly Damaged by Defendants' Conduct**

Even ignoring all of the foregoing and assuming *arguendo* that Zavolta as an individual were the relevant investor, she still would lack standing for two additional reasons.

First, Zavolta lacks standing to pursue her allegations of deficiencies in the Funds' disclosures regarding brokers' supposed incentives to sell Class A shares

---

[9]    See also Allen v. Wright, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); O'Shea v. Littleton, 414 U.S. 488, 494 (1974) ("If none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

over other share classes.  Compl. ¶¶ 33-35, 61-71.  The Complaint contains no indication that Zavolta consulted a broker about Lord Abbett shares.

Second, Zavolta had an indirect stake in certain Lord Abbett funds for less than five years.[10]  The gravamen of the lawsuit, however, is that the Lord Abbett prospectuses falsely "presente[d] class A shares as the best performing share class for the ***long term***."  Compl. ¶ 1 (emphasis added).  Plaintiff's own pleading alleges that the prospectus disclosed that, for holding periods of five years or less, Class B and Class C shares had higher returns than Class A shares.  Compl. ¶ 74; Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 5.  Thus if (as her conduct suggests) Zavolta intended to maintain her indirect stake in the Lord Abbett funds for less than five years, it seems clear that she could not have been deceived and is not among the "long-term investors," Compl. ¶ 76, allegedly damaged by defendants' conduct.

---

[10]    As noted in Section A, Zavolta's retirement plan opened its account with Lord Abbett in or about June 2004, and Zavolta received a final distribution from the plan in or about December 2007.

**ARGUMENT IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6): THE COMPLAINT
<u>FAILS TO STATE A CLAIM</u>**

If the Court concludes that Zavolta is a proper plaintiff, defendants submit that the Complaint must be dismissed for failure to state a claim.[11]

## I.    MOST OF THE COMPLAINT MIRRORS A PLEADING DISMISSED BY THE SIXTH CIRCUIT IN <u>BENZON</u>

Most of the Complaint is substantially similar to the pleading rejected by the Sixth Circuit in <u>Benzon v. Morgan Stanley Distribs., Inc.</u>, 420 F.3d 598 (6th Cir. 2005).  This Court adopted <u>Benzon</u> as persuasive authority in a recent published opinion, <u>Ulferts v. Franklin Res., Inc.</u>, 554 F. Supp. 2d 568, 575-76 (D.N.J. 2008), <u>adhered to on reconsideration</u>, 567 F. Supp. 2d 678 (D.N.J. 2008) (also relying on <u>Benzon</u>).

### A.    <u>Benzon</u> and This Case Involve Substantially Similar Complaints

In <u>Benzon</u>, plaintiffs asserted § 10(b) claims against the investment adviser and distributor of Morgan Stanley mutual funds on behalf of investors in Class B

---

[11]    The Complaint expressly refers to the prospectus dated March 1, 2007 for Lord Abbett Affiliated Fund, Compl. ¶¶ 4 n.2, 40, 41 n.4, 51, 74; the prospectus dated May 1, 2007 for the Lord Abbett Mid Cap Value Fund, Compl. ¶¶ 4 n.2, 41 n.4, 47; and the prospectus dated April 1, 2007 for the Lord Abbett Balanced Strategy Fund, Compl. ¶¶ 43, 51 n.5, 69.  Copies of these prospectuses, as well as the contemporaneous SAIs are attached as exhibits 1-6 to the Declaration.  These materials are appropriately considered on a 12(b)(6) motion to dismiss.  <u>See, e.g.</u>, <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2509 (2007); <u>Ulferts v. Franklin Res., Inc.</u>, 554 F. Supp. 2d 568, 573 (D.N.J. 2008).

shares of those funds.  Id. at 601-02.  Like other fund groups (including the Lord Abbett funds, see Compl. ¶ 2), most Morgan Stanley Funds were offered in different share classes, including Class A, Class B, and Class C shares.  Id. at 602.

The Benzon plaintiffs alleged that the Morgan Stanley Funds' prospectuses failed to provide sufficient disclosures regarding the value of Class B shares relative to other share classes.  Id. at 602.  According to plaintiffs, Class B shares were inferior to Class A and/or C shares for any type of investment strategy, regardless of the amount of the investment or the intended holding period.  Id. at 603.  In other words, while Class B shares were not always the worst option, the Benzon plaintiffs claimed (and the Sixth Circuit assumed for purposes of the motion to dismiss) that they were never the best option.  Id. at 603, 608 n.5.  The Benzon plaintiffs alleged that defendants promoted Class B shares even though they knew that Class B investors would pay more fees and earn lower profits than if they had chosen, depending on their circumstances, either Class A or Class C shares, and that defendants knowingly failed to inform investors of this fact.  Id. Indeed, the Benzon plaintiffs claimed that the Morgan Stanley prospectuses were affirmatively misleading in that they suggested that "it may be a rational strategy to invest amounts up to $100,000 in B shares when it is a 'mathematical fact' that Class A shares will yield higher net returns on investments over $50,000 than Class B shares."  Id. at 607.

16

The <u>Benzon</u> plaintiffs additionally alleged that the Morgan Stanley Fund prospectuses improperly failed to disclose that the investment adviser, distributor, and brokers all stood to make more money per dollar invested from the sale of Class B shares than from the sale of other share classes.  <u>Benzon</u>, 420 F.3d at 603.

The district court dismissed the federal claims in the complaint with prejudice, <u>Benzon</u>, 420 F.3d at 605, and the Sixth Circuit affirmed.  <u>Id.</u> at 614.

Most of the allegations Zavolta proffers in this case are substantially similar to those rejected in <u>Benzon</u> – except this time plaintiff targets Class A rather than Class B shares.

### B. <u>Benzon</u>, <u>Ulferts</u>, and Other Authorities Demonstrate that There Are No Actionable Omissions in the Prospectus

As with the plaintiffs in <u>Benzon</u> and <u>Ulferts</u>, Zavolta has failed to plead an actionable omission.  It is clear that Zavolta has alleged no misstatement or material omission and has failed to demonstrate either of the prerequisites to a duty to disclose that apply in this context: (i) a statute or rule requiring disclosure – in this context, Form N-1A, or (ii) a need to clarify a misleading statement already made.  <u>Ulferts v. Franklin Res., Inc.</u>, 554 F. Supp. 2d 568, 575 (D.N.J. 2008).

### 1. The Supposed "Failure" to Disclose Relative Account Values Is Not Actionable

Zavolta alleges that a table of relative projected account values of share classes was necessary to make the Funds' prospectuses not misleading.  <u>See</u>

Compl. ¶¶ 49-60.  She claims that without such information, four portions of the prospectus – (i) the "fee table," Compl. ¶ 40, (ii) the "expense example," Compl. ¶ 41, (iii) the "financial highlights," Compl. ¶¶ 43-44, and (iv) the distribution and service fees table, Compl. ¶ 47 – were misleading because they portrayed A shares as the "least expensive," Compl. ¶ 39, or "best performing." Compl. ¶¶ 45, 47.

These allegations are without merit.

### a.    Lord Abbett Had No Duty to Disclose Relative Account Values, Which Are Immaterial in Light of the Information Already Included in the Prospectus

In light of its numerous highly specific and detailed requirements, the SEC's Form N-1A amounts to a comprehensive regulatory regime governing mutual fund disclosures.[12]  Indeed, the vast majority of a mutual fund prospectus' content – including the "fee table" and "expense example," Form N-1A at Item 3, is specifically required by Form N-1A.  See Ulferts v. Franklin Res., Inc., 554 F. Supp. 2d 568, 575 (D.N.J. 2008) ("Form N-1A prescribes the required contents of a fund['s] prospectus."), adhered to on reconsideration, 567 F. Supp. 2d 768

---

[12]    The SEC periodically revises Form N-1A.  Unless otherwise noted, references to Form N-1A throughout this memorandum refer to the version of Form N-1A in effect on the date of the filing of the Complaint.  A copy of this version of the form is attached as Exhibit 1 to this Memorandum.  The SEC recently adopted additional amendments to the Form effective March 31, 2009.  See Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-End Management Investment Companies, Release No. 33-8998 (Jan. 13, 2009), 74 Fed. Reg. 4546 (Jan. 26, 2009).

(D.N.J. 2008) (explaining that certain basic information must be disclosed in a prospectus and that mutual funds "may disclose certain additional information in [an SAI]," id. at 681).  Because Form N-1A includes "all of the requirements necessary for funds to prepare new or amend existing registration statements,"[13] there ordinarily is no duty to disclose additional information.[14]

Form N-1A does not require disclosure of relative account values.  To the contrary, the SEC has explicitly considered and rejected requiring such a disclosure.  For example, when amending Form N-1A to add the "expense example" requirement in 1988, the SEC stated in the adopting release that "[b]ecause the Example will focus on fund expenses and not account values, the possibility that

---

[13]    Adopting Release:  Registration Form Used by Open-End Management Investment Companies, Securities Act Release Nos. 33-7512, 34-39748, 63 Fed. Reg. 13916, 13940 (March 23, 1998).

[14]    See, e.g., In re Morgan Stanley Tech. Fund Sec. Litig., Nos. 02 Civ. 6153 (BSJ), 02 Civ. 8579 (BSJ), 2009 WL 256005 at *8 (S.D.N.Y. Feb. 2, 2009) ("Given the specificity of the requirements set forth in Form N-1A, Plaintiffs' argument that the alleged disclosures are required by the Form's *general* directive to disclose 'essential information' to assist an investor in comparing the fund with others [see Compl. ¶ 58 (same allegation)], is unpersuasive."); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 248-49 (S.D.N.Y. 2003) (in light of the "extensive congressional and regulatory oversight" of mutual funds, the fact that "no portion" of Form N-1A required the disclosure of such information meant that such disclosure was not required).

investors will be misled and believe that these figures represent projections is significantly diminished."[15]

Significantly, moreover, the SEC has instructed that mutual fund prospectuses should "[a]void excessive detail" and that disclosures should primarily be "designed to assist an investor in comparing and contrasting the Fund *with other funds*," rather than contrasting share classes with one another.  Form N-1A, Gen'l Instr. C.1(b), (c).   Responsibility for providing particularized advice about the suitability of specific share classes (as well as broker-dealer conflicts of interests) falls on each investor's broker or other financial intermediary.[16]   Accordingly,

---

[15]   Consolidated Disclosure of Mutual Fund Expenses, Securities Act Release No. 6752, Investment Company Act Release No. 16244 (Feb. 1, 1988), 53 Fed. Reg. 3192, 3195 (Feb. 4, 1988) (emphasis added).  Similarly, when it amended Form N-1A in 1995 in connection with its adoption of a regulatory framework for mutual funds to issue multiple classes of shares, the SEC specifically considered whether to include a line graph comparing the performance of each share class assuming an investment of $10,000 and 5% return.  Exemption for Open-End Management Investment Companies Issuing Multiple Classes of Shares; Disclosure by Multiple Class and Master Feeder Funds; Voting on Distribution Plans, Securities Act Release No. 7143, Investment Company Act Release No. 20915 (Feb. 23, 1995), 60 Fed. Reg. 11876, 11884 (Mar. 2, 1995).  After receiving public comment raising the concern that such disclosure could be confusing or misleading, the SEC decided against adding the requirement. 60 Fed. Reg. at 11884.

[16]   See generally Lewis D. Lowenfels & Alan R. Bromberg, Suitability in Securities Transactions, 54 Bus. Law. 1557 (1999);  Financial Industry Regulatory Authority ("FINRA") Conduct Rule 2310(a) (requiring members to recommend suitable securities and to obtain individualized information from customers to facilitate such recommendations).  In recent years, the SEC and NASD (now FINRA) have brought enforcement actions against brokerage firms that have failed

when the SEC chose "not to adopt[] most of the proposed disclosure requirements" regarding multiple class mutual funds, it decided to focus on "consumer education" and the "duties of sales representatives when recommending" multiple class funds "[i]nstead of relying on prospectus disclosure."[17]

Against this backdrop, it is unsurprising that <u>Benzon</u> rejected substantially the same claim advanced by plaintiff Zavolta.  Consistent with the SEC pronouncements summarized above, <u>Benzon</u> concluded that it is doubtful that the disclosure plaintiffs proposed would even "necessarily be helpful to prospective investors" given the need to avoid "delug[ing]" investors with "marginally useful information."  <u>Benzon</u>, 420 F.3d at 609 n.6 (citation and internal quotation marks omitted).  In any event, <u>Benzon</u> held that, even if statements of the type proposed by plaintiffs might have facilitated an investor's task in choosing a share class, the statements were immaterial in light of the abundant information already mandated by Form N-1A. <u>Id.</u> at 608-09.

---

to meet their obligations in this regard.  <u>See</u> "NASD Settles Cases Against MML Investors Services, NYLIFE Securities, Securities America and Northwestern Mutual Investment Services for Fines Totaling Over $1.2 Million for Failures Relating to Mutual Fund Sales," NASD Press Release (June 28, 2007), available at http://www.finra.org/Newsroom/NewsReleases/2007/P019355.

[17]    Exemption for Open-End Management Investment Companies Issuing Multiple Classes of Shares; Disclosure by Multiple Class and Master Feeder Funds; Voting on Distribution Plans, Securities Act Release No. 7143, Investment Company Act Release No. 20915 (Feb. 23, 1995), 60 Fed. Reg. 11876, 11881-82 (Mar. 2, 1995).

**b.**   **Plaintiff's Attacks on Tables and Other Disclosures Mandated by or Consistent with Form N-1A Should Be Rejected**

Plaintiff's additional allegations concerning the supposed need to disclose relative account values are meritless.

***The fee table.***   Zavolta alleges that the "fee table" was misleading because it portrayed Class A shares as "the least expensive share class." Compl. ¶ 40.   To support this allegation, Zavolta reprints a portion of the prospectus fee table from the March 1, 2007 Lord Abbett Affiliated Fund prospectus.  But looking at the entire fee table refutes the allegation.  While Zavolta's excerpt accurately discloses that Class A shares have lower annual fees (.82%) than Class B or C shares (each at 1.47%), Compl. ¶ 40, the entire fee table discloses that Class A shares are not necessarily "the least expensive share class," because unlike Class B and C shares, Class A shares bear up to a 5.75% sales charge. Compl. Ex. 2 (entire expense table excerpted in Compl. ¶ 40); Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 6.

Indeed, the fee table about which Zavolta complains is required by – and conforms scrupulously with – Form N-1A.  See Benzon, 420 F.3d at 608; Form N-1A, Item 3 (setting forth the requirement of a fee table).  And it provides information enabling a shareholder (such as the retirement plan in which Zavolta participated) to make an informed choice about which share class is appropriate.

***The expense example.***   Zavolta next alleges that the "Expense Example['s]" accurate disclosure that Class A shares have lower cumulative expenses over ten years than B or C shares, Compl. ¶ 41, misleadingly implies that "class A shares represent a better long-term choice than either class B or class C shares." Compl. ¶ 42.  This is nonsense.  The March 1, 2007 Affiliated Fund prospectus excerpted in the Complaint merely states – using the precise language required by Form N-1A – that "[t]his example is intended to help you compare the *cost* of investing in the Fund with the *cost* of investing in other mutual funds." Compl. Ex. 2, page 55 (emphasis added), Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 7.  <u>See</u> Form N-1A, Item 3 (specifying this language and providing format for the required example); <u>Benzon</u>, 420 F.3d at 608.

***The financial highlights tables.***   Zavolta next alleges that the financial highlights tables are misleading in two ways.  Compl. ¶¶ 43-46.

- The tables fail to take into account Class A share sales charges.  Compl. ¶ 45.

This allegation also makes no sense.  As the Complaint acknowledges, the prospectuses plainly disclose that the returns in the tables "do not consider the applicable sales load."  Compl. ¶ 45; Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 46.  Furthermore, Lord Abbett does not have discretion in the matter, for Form N-1A expressly commands: "Do not reflect sales load or account

fees in the initial investment, but, if sales loads or account fees are imposed, note that they are not reflected in total return." Form N-1A, Item 8, Instr. 3(b).

- The tables fail to take into account the fact that B shares convert into class A shares after 8 years. Compl. ¶ 45.

The financial highlights tables do not reflect the fact that Class B shares convert into A shares after 8 years for the simple reason that the table, as instructed by Form N-1A, only "[p]resent[ed] the information ... for each of the last 5 fiscal years." Form N-1A, Item 8(a), Instr. 1(a).  See Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 43-46.  Nor did the Funds conceal the fact of the conversion.  Elsewhere the same prospectus expressly discloses, "Class B shares will automatically convert to Class A shares after the eighth anniversary of your purchase of Class B shares."  Id. at 6.  See also id. at 21, 28.

*The distribution and service fees table.*  Finally, Zavolta complains of the "distribution and service fees table" and the language preceding it, Compl. ¶ 47, Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 30, apparently because the table accurately discloses that A shares have lower ongoing distribution and service fees than Class B or C shares do.  Compl. ¶¶ 47-48.  Again, however, the table accurately describes exactly what it purports to describe. And the form of disclosure is drawn directly from Form N-1A.  See Form N-1A, Item 7(b) (requiring Fund prospectus to "provide disclosure to the following effect:" … "Because these fees are paid out of the Fund's assets on an on-going basis, over

time these fees will increase the cost of your investment and may cost you more than paying other types of sales charges.").

### 2.    Lord Abbett's Alleged Failure to Disclose Relative Profitability of Class A Shares or Broker-Dealer Compensation Is Not Actionable

Zavolta alleges that Lord Abbett "received the greatest profits" from the sale of Class A shares, Compl. ¶ 61, and therefore "crafted [broker-dealer] commission arrangements that encouraged the sale of class A shares over class B or class C shares."  Compl. ¶ 62.  According to Zavolta, "Lord Abbett did not adequately disclose these arrangements in the fund prospectuses, nor the additional conflicts of interest that resulted." Compl. ¶ 62.

Once again, however, the disclosure in the prospectuses easily satisfies the specific requirements of Form N-1A.  Zavolta does not even contend otherwise. For example, as already noted, the fund prospectuses clearly and accurately disclose the amount and timing of the sales charges applicable to each share class. The prospectuses also disclose that broker-dealers are compensated for their efforts by receiving a portion of the front-end sales load in the case of Class A shares,[18] and through the use of 12b-1 fees in the case of all share classes, id. at 30.  The prospectuses further disclose that, "[i]n addition to the various sales commissions and 12b-1 fees described above, Lord Abbett, Lord Abbett Distributor and the

---

[18]    Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 21.

Fund may make other payments to dealers and other firms authorized to accept orders for Fund shares." Id. at 31. And the SAI, which is incorporated by reference in the prospectus,[19] and which is part of the prospectus "as a matter of law," White v. Melton, 757 F. Supp. 267, 269 (S.D.N.Y. 1991) (citations omitted), states that "[a] salesperson, such as a broker, or any other person who is entitled to receive compensation for selling Fund shares may receive different compensation for selling one class than for selling another class." Lord Abbett Affiliated Fund SAI (March 1, 2007) at 25.

That Zavolta "would like even more disclosure misses the point that a violation of § 10(b) and Rule 10b-5 requires that the company have a duty to disclose information that is material." Ley v. Visteon Corp., 543 F.3d 801, 808 (6th Cir. 2008). And in this context as well, the SEC has sensibly concluded that point-of-sale disclosures by broker-dealers rather than prospectus disclosures are more useful to investors. See Benzon, 420 F.3d at 612 & n.9 (rejecting claim similar to plaintiff's and observing that "if [plaintiffs'] financial advisors were

---

[19]    The rear cover of the Lord Abbett Affiliated Fund Prospectus (March 1, 2007) discloses that "[t]he SAI provides more details about the Fund and its policies. A current SAI is on file with the [SEC] … and is incorporated by reference (is legally considered part of this prospectus). The SAI is available free of charge at www.LordAbbett.com, and through other means as indicated on the left."

not forthcoming with investors about the broker compensation structure, those investors may have individual claims [against their financial advisors]").[20]

### 3.    As in <u>Benzon</u>, There Is No Basis for "Scheme" Liability

To the extent that plaintiff's allegation that  "as a matter of mathematical fact … class A shares were never in the best interest of any rational investor [investing less than $50,000],"  Compl. ¶¶ 21, 38, is an attempt to establish so-called "scheme" liability, the theory fails as a matter of law.    As <u>Benzon</u> explains:

> Plaintiffs' complaint does not contend that Class [A] shares are worthless; it just asserts that other securities offered by Defendants are worth more.  The fact that Defendants have offered certain securities which are more valuable to investors than other securities it offers does not constitute fraud and is not actionable under Rule 10b-5(a) and (c), particularly given that Defendants' prospectuses disclose the information necessary to determine the relative value of the different class shares.

<u>Benzon</u>, 420 F.3d at 611.  The Sixth Circuit added that its decision did not leave plaintiffs without a remedy.  <u>Id.</u>    If plaintiffs' brokers inappropriately invested plaintiffs' funds into Class B shares when other shares were obviously preferable, plaintiffs might well have a cause of action against their brokers.  <u>Id.</u>

---

[20]    The case cited in the Complaint (¶ 65), <u>Siemers v. Wells Fargo & Co.</u>, No. 05-04518 (WHA), 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006), dealt with so-called "shelf space" arrangements with funds' brokers.  Such arrangements are not at issue in this case.  To the extent that <u>Siemers</u> may be indirectly relevant, it is inconsistent with <u>Benzon</u> and with this Court's decision in <u>Ulferts</u>.  <u>See</u> <u>Siemers</u>, 2006 WL 2355411 at *7 ("respectfully disagree[ing] with <u>Benzon</u>").

## II.   PLAINTIFF FAILS TO PLEAD MATERIALITY WITH RESPECT TO HER ALLEGATIONS THAT THE INVESTMENT PERFORMANCE TABLES DO NOT REFLECT THAT CLASS B SHARES CONVERT INTO CLASS A SHARES AFTER EIGHT YEARS

Plaintiff has advanced one set of allegations that differ from the claims rejected in <u>Benzon</u>.  She contends that the investment performance tables in the prospectus fail to reflect that Class B shares convert into Class A shares after eight years, thereby falsely implying that, after a ten-year holding period, Class A shares would have higher cumulative returns and account values than B shares. Compl. ¶¶ 72-78; Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 5. These allegations fail as well.

"Establishing materiality is the first step for a plaintiff with a section 10(b) claim." <u>In re Merck & Co. Sec. Litig.</u>, 432 F.3d 261, 268 (3d Cir. 2005) (citation and internal quotation marks omitted).  "[A] fact or omission is material only if there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available to the investor."  <u>In re NAHC Sec. Litig.</u>, 306 F.3d 1314, 1330 (3d Cir. 2002) (quoting <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988)).  Accordingly, it is a "well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." <u>In re Donald J. Trump Casino Sec. Litig.</u>, 7 F.3d 357, 364 (3d Cir. 1993).

28

See also Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965-66 & n.5 (2007) (complaint must allege enough facts to "enter the realm of plausible liability").

The alleged failure of the investment performance table to reflect that Class B shares convert into Class A shares after eight years is immaterial.

The investment performance table does not state that it reflects the conversion of Class B shares to Class A shares after eight years. See Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 5. But assuming *arguendo* that a prospectus reader who actually examined the investment performance table would have (a) assumed that the table reflects the conversion of Class B shares to Class A shares after eight years, and (b) therefore concluded that this implied that, during the ten years prior to December 31, 2006, Class A shares had been more profitable than Class B shares, it is implausible that the reader would have (c) leapt to the conclusion that Class A shares usually (or invariably) will be more profitable over the long term for members of the putative class – at least if she availed herself of the wealth of contrary information in the prospectus and SAI.

The text preceding the investment performance table notes that "[t]he Fund's past performance … is not necessarily an indication of how the fund will perform in the future." Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 4.

And the prospectus and SAI clearly indicate that Class A shares generally are *not* the best share class for investors intending to hold for the long term and purchase less than $50,000 worth of Fund shares.  The prospectus states:

> You should read this section carefully to determine which class of shares is best for you and discuss your selection with your investment professional.  You should make a decision only after considering various factors, including the expected effect of any applicable sales charges and the level of class expenses on your investment over time, the amount you wish to invest, and the length of time you plan to hold the investment….

> [I]n many cases, *if you are investing $100,000 or more* and plan to hold the shares for a long time, you may find Class A shares suitable for you because of the expected lower expenses and the reduced sales charges available.  You should discuss purchase options with your investment professional.

> For more information on selecting a share class see "Classes of Shares" in the Statement of Additional Information.

Lord Abbett Affiliated Fund Prospectus (March 1, 2007) at 20 (emphasis added).

The SAI further explains:

> Once you decide that the Fund is an appropriate investment for you, the decision as to which class of shares is better suited to your needs depends on a number of factors that you should discuss with your financial adviser….

> *Investing for the Longer Term*.  If you are investing for the longer term (for example, to provide for future college expenses for your child) and do not expect to need access to your money for seven years or more, *Class B shares may be an appropriate investment option, if you plan to invest less than $50,000.  If you plan to invest more than $50,000 over the long term, Class A shares will likely be more advantageous than Class B shares or Class C shares*, as discussed above, because of the effect of the expected lower expenses for Class A shares and the

30

reduced initial sales charges available for larger investments in Class A shares under the Fund's Rights of Accumulation.

Lord Abbett Affiliated Fund SAI (March 1, 2007) at 24-25 (emphasis added).

The Complaint should be dismissed based on the clarity of these disclosures alone. See, e.g., In re NAHC Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) (any misstatement regarding corporation's goodwill in Form 10-K was immaterial where previously filed proxy materials disclosed the impact of the proposed liquidation); Longman v. Food Lion, Inc., 197 F.3d 675, 684-85 (4th Cir. 1999) (issuer's false denials of labor law violations were immaterial as a matter of law because the denials were contradicted by various statements by a labor union and thus already known to the market).[21]

Indeed, it appears to be indisputable that investors – and their financial intermediaries who must recommend a suitable share class to their customers – had ample information enabling them to determine when Class A shares were in the interest of putative class members. This is evident from a *New York Times* article dated July 13, 2008 (attached as Ex. 7 to the Declaration) that presumably spawned this lawsuit. Apparently using only the Funds' public disclosure documents, and the free, publicly available mutual fund expense calculator available on the FINRA

---

[21]    See also Phillips v. LCI Int'l, Inc., 190 F.3d 609, 616 (4th Cir. 1999) (court granted 12(b)(6) motion with respect to statement  "we're not a company that's for sale;" although the statement was demonstrably false, the court concluded it was immaterial in light of other publicly available information).

website, www.FINRA.org, the reporter was able to determine that the investment performance table "overlook[ed] the B share compensation change in the eighth year."

Here, as in In re Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005), the Court should not assume that "investors and [financial intermediaries] stood in uncomprehending suspension" for years "until the [*New York Times*] brought light to the market's darkness." Id. at 270. The *New York Times* reporter "simply did the math," id. at 271, and thus the failure to reflect the Class B conversion in the investment performance table is immaterial.[22]

## III.   THE COMPLAINT FAILS TO PLEAD SCIENTER

To "limit abusive securities class action suits," Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007), the Reform Act requires plaintiffs to state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. Id.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976). This

---

[22]   The calculations and assumptions made by the reporter in the case at bar were less complex than those considered in Merck, where the issuer not only failed to disclose the bottom line, but also all the necessary data to calculate it, and the *Wall Street Journal* reporter needed to make a significant assumption in order to calculate the bottom line. See Merck, 432 F.3d at 270. Here, moreover, putative class member had access to the services of broker-dealers, who presumably are skilled in this type of analysis.

means either (1) actual knowledge that a statement was materially false, or (2) a limited form of "recklessness," which requires that a speaker <u>subjectively</u> harbored serious doubts about – and thus lacks "a genuine belief" in – a statement.[23]

The "strong inference" requirement dictates that the inference of scienter arising from the allegations of the complaint "be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2510 (2007). Thus, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw" from the facts alleged, <u>id.</u>, and from other facts of which the Court may take judicial notice. <u>Id.</u> at 2509; <u>Winer</u>, 503 F.3d at 328.

## A.    The Complaint's Affirmative Allegations Do Not Create a Strong Inference of Scienter

The Complaint includes three basic categories of scienter allegations, none of which raises even a plausible inference of scienter.

1.    The Complaint is replete with conclusory accusations that defendants engaged in fraud.[24]    Such bald accusations are not allegations of "facts," 15 U.S.C.

---

[23]    <u>See</u> <u>McLean v. Alexander</u>, 599 F.2d 1190, 1197-98 (3d Cir. 1979).  Thus, it is not enough that the maker of the statement acted with "negligence – whether gross, grave or inexcusable."  <u>Id.</u> at 1198.

[24]    <u>See, e.g.</u>, Compl. ¶ 3 (defendants engaged in a "centralized, directed, and concerted scheme to defraud investors"); ¶ 13 ("defendants knew or recklessly

§ 78u-4(b)(2), at all.  They do nothing even to *contribute* to a "strong inference" (or any inference) that defendants acted with scienter "with respect to [any alleged] act or omission."  15 U.S.C. § 78u-4(b)(2).  See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (even before the Reform Act, allegations such as "[d]efendants … 'knew or were reckless in not knowing'" certain things are "so broad and conclusory as to be meaningless") (citation and internal quotation marks omitted); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999) (scienter pleading "may not rest on a bare inference that a defendant 'must have had' knowledge of the facts") (citations and internal quotation marks omitted); Ley v. Visteon Corp., 543 F.3d 801, 813 (6th Cir. 2008) (rejecting allegation that disclosures "'were often presented in an intentionally confusing manner'").

2.     Plaintiff relies heavily on the theory that defendants had a financial motive to encourage putative class members to invest in Class A shares rather than other classes of shares.  See, e.g., Compl. ¶¶ 1, 102 (defendants were motivated to induce investors into purchasing Class A shares in order to "reap[] excessive profits" through the fees charged to A share investors).  See also Compl. ¶¶ 32-34, 65-66, 69.

---

disregarded that the disclosures … omitted material information"); ¶ 36; ¶¶ 38-40, 45-47, 58 (various allegations that defendants "designed" or "depict[ed]" information in the Fund prospectuses in order to "mislead" investors); ¶ 59.

Similar allegations have been held to contribute little to an inference of scienter.  See, e.g., GSC Partners CDO Fund v. Washington, 368 F.3d 228, 238 (3d Cir. 2004) (that underwriter stood to receive underwriting and advisory fees did not support a strong inference of scienter; accepting this as a theory of scienter would "make Rule 9(b) … meaningless") (citation and internal quotation marks omitted); In re Eaton Vance Corp. Sec. Litig., 206 F. Supp. 2d 142, 153-54 (D. Mass. 2002) (allegation that defendants received management fees tied to the value of the mutual fund's assets constituted a "generalized motive ... that would apply in nearly every business" insufficient to establish a strong inference of scienter).

3.      Finally, plaintiff offers a handful of cryptic "Additional Scienter Allegations."   Compl. ¶¶ 79-86.   Plaintiff asserts that approximately 98% of investors consider their investments to be long term.  Compl. ¶ 80.  Plaintiff further alleges that, in reality, most mutual fund investors do not hold funds for more than 3 to 5 years, Compl. ¶ 80, and that (based on 2003 data) investors in one Lord Abbett fund held their investments for "less than the industry average of 4.6 years."  Compl. ¶ 83.  The "Additional Scienter Allegations" conclude by asserting that defendants sought to induce the purchase of Class A shares through false representations "[d]espite defendants' knowledge of investor behavior."  Compl. ¶ 85.

It is not apparent why plaintiff believes these allegations are relevant.[25] Construed most generously, however, plaintiff's "Additional Scienter Allegations" are merely another incarnation of plaintiff's financial motive allegations, and are thus insufficient for the reasons already discussed.

### B.    The Complaint's Scienter Allegations Are Based on Improper Group Pleading

Plaintiff acknowledges that she is relying on "group pleading." Compl. ¶ 13 (asserting that "[i]t is appropriate to treat defendants as a group for pleading purposes"). Under the group pleading doctrine, "where defendants are insiders with such control or involvement, their specific connection to fraudulent statements in group-published documents is unnecessary," and a plaintiff may avoid "pleading particular facts associating the defendants to the alleged fraud." Winer Family Trust v. Queen, 503 F.3d 319, 335 (3d Cir. 2007).

Unfortunately for plaintiff, the Third Circuit in Winer unequivocally rejected the group pleading doctrine. Id. at 335-37. Winer compels dismissal of the Complaint because, despite naming two companies as the only defendants in this case, the Complaint is devoid of any allegations suggesting that scienter may properly be imputed to Lord Abbett or LAD.

---

[25]    The alleged "redemption" data do not purport to reflect the behavior of the putative class – those who purchased Class A shares in amounts less than $50,000 with a 5.75% sales load. The alleged statistics consequently have no necessary bearing on this case.

Some circuits have adopted a categorical rule that, where a company's statements are at issue, the scienter allegations of a complaint must relate:

> to the state of mind of the individual corporate official or officials who make the statement (or order or approve its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004).[26]   Accord Winer, 503 F.3d at 336-337 (citing Southland with approval). The Complaint obviously flunks this version of the scienter requirement given that it does not mention any individual at Lord Abbett or LAD.

Other circuits allow a plaintiff to plead scienter against a company without alleging facts regarding the culpable state of mind of any specifically named individual officer, but only in limited circumstances.  For example:

> Suppose General Motors announced that it had sold one million SUVs in 2006 and the actual number was zero.  There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

---

[26]   This flows from the common law principle that where a subjective state of mind is an element of a cause of action also involving some sort of conduct such as misrepresentation, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that [company] on general principles of agency."  Id. (citing Restatement (Second) Agency § 275 cmt. b; § 268 cmt. d. (1958)).   Accord Restatement (Third) Agency § 5.03 cmt. d(2) (2006).

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d

190, 195-96 (2d Cir. 2008), quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc.,

513 F.3d 702, 710 (7th Cir. 2008).[27]

The alleged error in the investment performance tables in this case does not

approach the type of extreme factual scenario that might support an inference of

scienter against Lord Abbett and LAD without reference to the culpability of any

specifically named individual – even assuming *arguendo* that the Third Circuit

would allow a plaintiff ever to plead a company's scienter in this manner.[28]

## C.    Other Indisputable Facts Undermine Any Possible Inference of Scienter

Apart from plaintiff's allegations, it is necessary to consider the entirety of

the prospectuses and SAIs and other facts of which the Court should take judicial

---

[27]    Once the focus is (as it must be) on individuals in a company, it is clear that plaintiff's allegations focusing on the motive of the company generally cannot independently satisfy the "strong inference" requirement.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2511 (2007) (noting that "motive can be a relevant consideration" but that only "***personal*** financial gain ***may*** weigh heavily in favor of a scienter inference") (emphasis added).

[28]    Cf. Glazer Capital Mgmt. v. Magistiri, 549 F.3d 744-45 (9th Cir. 2008) (unnecessary to determine viability of collective scienter theory where challenged statements were not "so important and so dramatically false," id. at 744, that they could support a strong inference under the limited "exception to individualized scienter pleadings," id. at 745); Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 197 (2d Cir. 2008) (similar).

notice and to consider the "opposing inferences" that arise therefrom.   Tellabs, Inc.
v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510 (2007).

Given the primacy of broker-dealer responsibilities in providing advice on
suitable share classes, see generally Section I.B.1.a. above, misrepresenting the
relative merits of Class A shares in the prospectus likely would have been an
ineffective way to carry out the supposed scheme to improperly steer investors
towards Class A shares.  This underscores the implausibility of the inference that
any inaccuracy in the prospectus resulted from an intent to deceive.

More importantly, as discussed above, the prospectus and SAIs affirmatively
indicated that Class A shares generally were not the best choice for investors in the
putative class of those investing less than $50,000.  It strains credulity to argue that
defendants were attempting to deceive investors when these clear disclosures were
included along with the abundant additional accurate information enabling investors
and their financial intermediaries to determine the appropriate share class.

Under these circumstances, it is plain that Zavolta's inference of fraud "is
neither cogent, nor compelling, nor strong in light of competing inferences," Winer
Family Trust v. Queen, 503 F.3d 319, 329 (3d Cir. 2007) – such as that a mistake

was made in preparing the investment performance tables.  See In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 246 (8th Cir. 2008) (mistake is not fraud).[29]

## CONCLUSION

Defendants respectfully request that the action be dismissed for lack of subject matter jurisdiction, see Lusardi v. Xerox Corp., 975 F.2d 964, 974 (3d Cir. 1992) or, alternatively, that the Complaint be dismissed with prejudice on the merits.

Respectfully submitted,

K&L Gates LLP

By:      /s/ Christopher A. Barbarisi
Christopher A. Barbarisi
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ  07102-5252
(973) 848-4000

Jeffrey B. Maletta
Nicholas G. Terris
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20005-1600
(202) 778-9000

*Counsel for Defendants*

---

[29]    Plaintiff cannot seriously contend that she adequately pleads scienter with respect to any of the other alleged omissions, such as the supposed "failure" to disclose relative account values.   "It cannot be conscious misbehavior or recklessness for a defendant to fail to disclose in a prospectus information that is neither material nor required to be disclosed under applicable SEC regulations." Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208, 2006 WL 1008138, at *11 (S.D.N.Y. Apr. 18, 2006) (citation and internal quotation marks omitted).