# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ROSEMARIE ZAVOLTA,** *on behalf of herself and those similarly situated,* | **Civil Action No. 2:08-cv-04546** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **LORD, ABBETT & CO. LLC, and LORD ABBETT DISTRIBUTOR LLC,** | **HON. WILLIAM J. MARTINI** |
| **Defendants.** | |

## MEMORANDUM OPINION[1]

### I.     INTRODUCTION

Rosemarie Zavolta's employer established a 401(k) retirement plan, i.e., the Foreign Traffic Retirement Plan (the "Plan"). The Plan, apparently an ERISA plan, invested in class A shares sold by Lord Abbett Distributor LLC ("Lord Abbett Distributor") and managed by Lord, Abbett & Co. LLC ("Lord Abbett Manager," and collectively with Lord Abbett Distributor, the "Defendants"). Zavolta is a former participant in the Plan. Zavolta alleges that the Defendants knew or recklessly disregarded the fact that the contents of the Defendants' prospectuses omitted material information. On September 11, 2008, Zavolta

---

[1] For the convenience of the reader of this document in electronic format, hyperlinks to the Court's record and to authority cited herein may be inserted. No endorsement of any provider of electronic or other resources is intended by the Court's practice of using hyperlinks.

filed a single-count complaint, (the "Complaint"), alleging securities fraud, i.e., a 10b-5 action. (Doc. No. 1.) On April 6, 2009, the Defendants filed the instant motion to dismiss (the "Motion"). The Motion is now fully briefed. *See* Doc. No. 30 (the "Opening Brief"), Doc. No. 38 (the "Opposition Brief"), and Doc. No. 39 (the "Reply Brief").

Having considered the parties' filings, federal statutory law and regulations, case law, and persuasive scholarly authority, the Court, for the reasons elaborated below, will **GRANT** in part, and **DENY** in part, Defendants' motion to dismiss. Specifically, the Court will grant the Motion to Dismiss thirty days from the entry of the order filed contemporaneously with this opinion, unless Plaintiff files a motion to amend the Complaint, with a draft amended complaint, complying with federal and local rules, and making scienter allegations consistent with this opinion.

## II.    FACTUAL BACKGROUND ALLEGED IN THE COMPLAINT

Plaintiff makes the following factual allegations in the Complaint. The Foreign Traffic Retirement Plan, i.e., the Plan established by Zavolta's employer, invested in class A shares sold by Defendants, but not in class B shares or in class C shares.[2] Zavolta is a former participant in the Plan. Zavolta alleges that the Defendants knew or recklessly disregarded the fact that the contents of the Defendants' prospectuses, registration statements, semiannual

---

[2] To be clear, Defendants manage and sell a variety of Lord Abbett funds. The Plan allowed plan participants, such as Zavolta, to invest in a variety of such funds, but in each case only the class A shares associated with that particular fund.

2

reports, and annual reports (collectively the "Public Filings") omitted material information. Compl. ¶ 13.

More specifically, Plaintiff alleges that the Public Filings "present class A shares as the best performing share class for the long-term, causing the plaintiff and the Class members to purchase class A shares, when class B and/or class C shares would have been their best investment choice for any holding period." Compl. ¶ 1. Moreover, investors who purchased less than $50,000 of class A shares paid an upfront sales commission of 5.75%; investors in class B or C shares, by contrast did not pay upfront sales commissions, and, therefore, had a larger percentage of their initial investment invested. *Id*. ¶¶ 1-2. Given these investment characteristics, and the fact that class B shares convert into class A shares after 8 years, an investment under $50,000 was "*never* in the best interest of any rational investor for any holding period." *Id*. ¶ 3 (emphasis in the original).[3] Plaintiff argues that this information was not expressly disclosed in the Public Filings. It is not controverted by the parties that, although Zavolta invested less than $50,000, the Plan invested some amount over $50,000 and, therefore, ostensibly, the Plan (or its participants) recouped some or all of the upfront sales commission (or, at least, the sales commission already paid was, in effect, spread over a larger pool of investors, i.e., later investors paid sales fees at a rate lower than 5.75%). Furthermore, Plaintiff alleges that Defendants "earn[] far higher profits on sales of class A

---

[3] *Cf.* Compl. ¶ 21 (alleging a second breakpoint for those investing over $50,000 but under $100,000).

shares of the Funds than on sales of either class B or class C shares," *id.* ¶ 33, and pay broker-dealers more in regard to sales of class A shares, *id.* ¶ 34, giving broker-dealers a greater incentive to sell such shares. Detailed information relating to differential profitability and differential compensation to broker-dealers was omitted from the Public Filings. Plaintiff characterizes these differential payments as a conflict of interest and characterizes the omissions from the Public Filings as a prohibited failure to disclose under the securities law. *Id.* ¶¶ 61-71.

On September 11, 2008, Zavolta filed a single-count complaint alleging securities fraud, i.e., a 10b-5 action. (Doc. No. 1.) On April 6, 2009, the Defendants filed the instant motion to dismiss. The motion seeks dismissal under <u>Federal Rules of Civil Procedure 12(b)(6)</u> (failure to state a claim), and 12(b)(1) (lack of subject-matter jurisdiction).


**III.    STANDARD OF REVIEW**

As stated, the Defendants' motion to dismiss is brought pursuant to the provisions of <u>Fed. R. Civ. P. 12(b)(6)</u>. This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, <u>*Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005)</u>, and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," <u>*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570</u>

4

(2007) (abrogating "no set of facts" language found in _Conley v. Gibson_, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." _Twombly_, 550 U.S. at 555. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. _Id_. Furthermore, in order satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." _Phillips v. County of Allegheny_, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting _Twombly_, 550 U.S. at 555).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. _Sands v. McCormick_, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." _Pension Benefit Guar. Corp. v. White Consol. Indus._, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." _Pryor v. Nat'l Coll. Athletic Ass'n_, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. _Jordan v. Fox, Rothschild, O'Brien & Frankel_, 20 F.3d 1250, 1261 (3d Cir. 1994).

The Defendants' motion to dismiss is also brought pursuant to the provisions of Fed. R. Civ. P. 12(b)(1). Although the text of Rule 12(b)(1) extends to "subject-matter jurisdiction," this rule may also be asserted to contest whether the allegations within a plaintiff's complaint establish prudential and constitutional standing. *See Common Cause of Penn. v. Pennsylvania, 558 F.3d 249, 257-59 (3d Cir. 2009); Maio v. Aetna, Inc., 221 F.3d 472, 481 n.7 (3d Cir. 2000)* ("Generally speaking, motions to dismiss on the grounds of a failure to allege an 'injury in fact' implicate constitutional standing principles and thus are predicated on Rule 12(b)(1) rather than Rule 12(b)(6).").

In adjudicating a Rule 12(b)(1) motion, a court "review[s] only whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court. Challenges to subject matter jurisdiction under Rule 12(b)(1) may be facial or factual." *Common Cause of Penn., 558 F.3d at 257* (citations omitted). "Accordingly, unlike a Rule 12(b)(6) motion, consideration of a Rule 12(b)(1) jurisdiction-type motion need not be limited; conflicting written and oral evidence may be considered and a court may decide for itself the factual issues which determine jurisdiction. When resolving a factual challenge, the court may consult materials outside the pleadings ...." *Koronthaly v. L'Oreal USA, Inc., Civil Action No. 07-5588, 2008 WL 2938045, at \*2 (D.N.J. July 29, 2008)* (citations omitted). "Plaintiffs, as the parties invoking the federal courts' jurisdiction, bear the burden of establishing their standing." *Common Cause of Penn., 558 F.3d at 257.*

6

## IV.   ANALYSIS

Defendants' Motion puts forward a variety of grounds in support of dismissing the action; these include, primarily, standing, materiality of contested disclosures, and scienter. For the reasons explained below, the Court finds that Plaintiff has standing, and so, the Court reaches the merits of this 10b-5 action. As to the merits, the Court finds that the Complaint fails to state a claim, and will dismiss this Complaint subject to Plaintiff's having a limited opportunity to file an amended complaint.

### A.   Standing

"The irreducible constitutional minimum of Article III standing consists of three elements. First, the plaintiff must have suffered a concrete, particularized injury-in-fact, which must be actual or imminent, not conjectural or hypothetical. Second, that injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, the plaintiff must establish that a favorable decision likely would redress the injury." *Toll Bros., Inc. v. Township of Readington,* 555 F.3d 131, 137-38 (3d Cir. 2009). Defendants, seeking dismissal under Rule 12(b)(1), argue that Plaintiff lacks Article III standing.

Defendants argue:

> 401(k) plans such as the plan in which Zavolta participated are a species of defined contribution plans governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA") .... In contrast to defined benefit plans, ERISA requires the assets of defined contribution plans to be allocated

for bookkeeping purposes to individual accounts within the plan for the *beneficial interest* of the participants, whose benefits in turn depend on the allocated amounts. Notwithstanding such participant level bookkeeping, as with other types of ERISA plans, 401(k) plan assets are held in trust and legally owned by the plann trustee. Accordingly, when addressing the contours of various remedies available to ERISA-regulated plans, courts often seek guidance from the common law of trusts.

As the foregoing indicates, the alleged injury in this case was to plan assets – not to any assets Zavolta [legally] owned personally – and any legal claim based on any such injury belongs to the plan rather than to Zavolta, and must be enforced by the plan or plan trustee. Zavolta thus lacks standing to pursue the claim on an individual basis.[4]

Plaintiff responds that she, not the plan, has standing, has suffered the injury-in-fact, and that her standing arises from her beneficial interest in the plan (or, what was her beneficial interest prior to cashing out her investment). Opposition Brief 8. Plaintiff relies on *Holmes v. Bartlett*, Civil Action No. 03-1176, 2004 WL 793190 (D. Or. Mar. 30, 2004) (Ashmanskas, M.J.), *adopted* 2004 WL 1173138 (May 21, 2004) (Jones, J.). The *Holmes* court explained that an ERISA plan beneficiary, as well as trustees, have standing to bring a securities law claim. *Holmes*, Civil Action No. 03-1176, 2004 WL 793190, at *2. *Holmes* is not fully persuasive. Its holding in regard to plan beneficiaries is dicta, and even the dicta was addressing whether claimants had standing to pursue a state securities law claim, not the federal 10b-5 cause of action at issue here. Plaintiff also cites *Atchley v. Qonaar Corp.*, Civil Action No. 81-6295, 1982 WL 1313 (N.D. Ill. Mar. 29, 1982), *rev'd on other grounds*, 704 F.2d 355 (7th Cir. 1983), which held that: "that one who buys securities through another

---

[4] Opening Brief 9-10 (emphasis added) (citations and footnotes omitted).

agent or trustee is not outside the protection of § 10(b) and Rule 10b-5: [the Seventh Circuit] did not preclude a principal or beneficiary from asserting, alone or with the trustee, a claim against the seller of securities." *Id.* at *2. Like *Holmes*, *Atchley* is not fully persuasive: it was addressing a claim arising in connection with an Individual Retirement Account (an "IRA"), as opposed to an ERISA investment. ERISA accounts are trust accounts administered by fiduciaries, as a result, the common law of trusts is persuasive authority in determining the law of ERISA plans. *See* <u>LaRue v. DeWolff, Boberg & Assocs., Inc.,</u> 552 U.S. 248, 128 S. Ct. 1020, 1024 n.4 (2008). However, it is not at all clear that the same trust principles described by the *Atchley* court as applying to IRAs also apply in the ERISA context. More importantly, the *Atchley* court was addressing prudential or statutory standing under Rule 10b-5, not Article III standing. (Of course, it is implicit in any such holding that Article III standing must also exist.) Plaintiff's remaining cases are even more inapposite – as they discuss suits brought by plaintiffs in the face of misconduct or otherwise conflicted trustees or plan fiduciaries. *See, e.g.*, <u>Norris v. Wirtz,</u> 719 F.2d 256 (7th Cir. 1983).

By way of reply, Defendants argue that Article III standing, as opposed to statutory standing, requires "that the plaintiff have legal ownership of the claim." Reply Brief 7. In support of that position, Defendants quote <u>W.R. Huff Asset Mgmt. v. Deloitte & Touche LLP,</u> 549 F.3d 100 (2d Cir. 2008), for the proposition that: "*Sprint* makes clear that the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, *or a proprietary interest in, the claim.*" *Id.* at 106 (emphasis added) (citing <u>Sprint Commc'ns Co.</u>

*v. APCC Servs., Inc.*, 128 S. Ct. 2531, 2543-44 (2008)). The Court agrees: the correct standard is that announced by the Supreme Court in *Sprint* which allows for Article III standing where a complainant either has legal title or otherwise has a proprietary interest in the claim. Given that Plaintiff does not have legal title, the question is whether Plaintiff has a proprietary interest.

In expounding on ERISA law, "courts often seek guidance from the common law of trusts." Opening Brief 10 (collecting case law); *see, e.g.*, *LaRue*,128 S. Ct. at 1024 n.4.

> Every property owner, whether his interest is legal or equitable has a right to have third persons refrain from injuring or appropriating the subject of his property right. It is therefore a truism that a trust beneficiary, being the owner of an equitable property right, has the support of the courts in his claim that strangers [as opposed to the trustee] shall not cause damage to the trust res or [in his claim that strangers are] prevent[ing] the application of [the trust res] to the purposes of the trust.

GEORGE T. BOGERT, TRUSTS 609 (6th ed. 1987) (collecting case law). Other authorities agree. *See, e.g.*, 5 AUSTIN WAKEMAN SCOTT ET AL., SCOTT & ASCHER ON TRUSTS 1995 (5th ed. 2008) ("The beneficiaries, or any of them, can maintain a suit in equity against the transferee if the transferee took with notice of the breach of trust or paid no value.") (collecting case law); *cf.* RESTATEMENT (SECOND) OF TRUSTS § 282 cmt. a, at 44 (1959) ("As long as the trustee is ready and willing to take the proper proceedings against ... third persons [who wrong the trust], the beneficiary cannot maintain a suit in equity against [third parties]."). Generally all authorities agree that trust beneficiaries have a property right in the trust res. *See W.R. Huff Asset Mgmt.*, 549 F.3d at 106. As a matter of first impression it

appears that such an interest is sufficient to confer Article III standing.

Admittedly, the trust law authorities quoted above also discuss those circumstances in which trust law favors or requires the trustee, rather than the beneficiary, to bring a suit (with or without joining the beneficiaries) against third parties, or it requires the beneficiaries to join the trustee or to sue the trustee to bring the action in the name of the trust. "*Ordinarily the trustee, and he alone, is permitted to sue the wrongdoer.*" BOGERT, TRUSTS, *supra*, at 610 (emphasis added). But this general rule is not grounded in any understanding that the beneficiary lacks a property interest in the trust (the *sine qua non* of Article III standing) or that the beneficiary somehow lacks (Article III or prudential) standing. The exceptions to the general rule, which favors trustee-brought actions, prove at least that much. For example, trust law will permit a beneficiary to bring suit when the office of trustee is vacant. *See* 5 SCOTT & ASCHER ON TRUSTS, *supra*, at 1994. The preference for trustee-brought actions is grounded in policies unrelated to the injury-in-fact prong of Article III standing, which is not particularly surprising given that the overwhelming majority of the cases cited in these treatises were heard in state, not federal, court.

Furthermore, Zavolta's claim seems to fall under one of the recognized exceptions to the general rule against actions being brought by trust beneficiaries. Prior to bringing this suit on September 11, 2008, Zavolta had cashed-out her interest in the Plan and received her last distribution on or about December 2007. Opening Brief 7. "If the beneficiary is in possession of the subject matter of the trust, he can maintain such actions against the third person as a

11

person in possession is entitled to maintain." RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 281(2). Arguably, this exception would permit Zavolta to bring the instant suit. She, and not the trustee, is in possession of her share of the "trust" res.[5]

B.     Scienter

The Complaint asserts a Rule 10b-5 claim based upon reckless or intentional omissions in regard to persons who purchased class A shares on or after September 11, 2003. *See* 17 C.F.R. § 240.10b-5(b) ("It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security."). Under the regulation, a plaintiff must allege that a defendant made a misstatement or an omission of material fact with scienter (including intentional or reckless conduct) in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's reliance was the proximate cause of their injury. *Id.*; *Institutional Invs. Group v. Avaya, Inc.*, 564 F.3d 242, 267-68 (3d Cir. 2009) (Scirica, C.J.).

---

[5] Likewise, a beneficiary is precluded from bringing suit only in circumstances where the trustee could otherwise bring suit. *See* RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 282(1) . Here it appears that the trustee could not bring suit. Zavolta invested less than $50,000 and paid a 5.75% commission. The Plan, by contrast, has invested in excess of $50,000 and has, therefore, "*benefitted* from sales charges lower than 5.75%." Opening Brief 8 (emphasis added). In short, Zavolta was allegedly injured in a way that the Plan was not. Because the Plan's trustee (on behalf of the Plan) cannot vindicate Zavolta's interest, it seems to follow, as a matter of the common law of trusts, that Zavolta has standing to do so.

Generally, in ruling on a 12(b)(6) motion to dismiss, the court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotation marks omitted). Likewise, the court will draw reasonable inferences from the factual allegations of the complaint in favor of the non-movant. *Id*. Notwithstanding these rules of general applicability relating to the review of pleadings, the Public Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4 *et seq*., changed that standard in regard to inferences involving factual allegations relating to scienter in securities law cases. In other words, factual allegations relating to scienter in a 10b-5 action are more closely scrutinized. In other words,

> a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b). Instead, under the PSLRA's exacting pleading standard for scienter, any private securities complaint alleging that the defendant made a false or misleading statement must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Avaya, Inc.*, 564 F.3d at 253 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). *See generally* 15 U.S.C. § 78u-4(b)(2). For an inference connected to factual allegations to establish scienter, it "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Furthermore, the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that

belief with particularity." _Winer Family Trust v. Queen_, 503 F.3d 319, 326 (3d Cir. 2007).

_See generally_ 15 U.S.C. § 78u-4(b)(1). Finally, allegations based on group pleading[6] fail to

comport with the requirements of the PSLRA. _Winer Family Trust_, 503 F.3d at 335.

In this case, there are _no_ individual defendants. The only defendants are corporate

entities. In order to plead scienter sufficient to withstand a motion to dismiss, a plaintiff's

complaint must allege "with particularity facts giving rise to a strong inference that the

defendant [i.e., the corporation] acted with the required state of mind." _Avaya_, 564 F.3d

at 253. The same standard applies even if the defendant is a corporation, rather than an

individual. If the defendant is a corporation, the complaint must allege with particularity facts

giving rise to a strong inference that "_someone_ whose intent could be imputed to the

corporation acted with the requisite scienter." _Teamsters Local 445 Freight Div. Pension_

_Fund v. Dynex Capital Inc._, 531 F.3d 190, 195 (2d Cir. 2008) (emphasis added); _see also_

_Southland Secs. Corp. v. INSpire Ins. Solutions, Inc._, 365 F.3d 353, 366 (5th Cir. 2004) ("It

is not enough to establish fraud on the part of a corporation that one corporate officer makes

a false statement that another knows to be false. A defendant corporation is deemed to have

the requisite scienter for fraud only if the individual corporate officer making the statement

has the requisite level of scienter ...." (quoting _In Re Apple Computer, Inc. Secs. Litig._, 243

---

[6] _Winer Family Trust_, 503 F.3d at 335 ("The group pleading doctrine is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations.").

F. Supp. 2d 1012, 1023 (N.D. Cal. 2002))). Persons whose intent could be fairly imputed to the corporation include corporate directors, officers, and perhaps, certain employees and other agents, such as those charged by the corporation with disseminating the allegedly "untrue statement of material fact." 17 C.F.R. § 240.10b-5(b). Such persons are often named-defendants in the same action, or listed as "John Doe" defendants, or expressly identified, by name or by office, in the complaint even if not joined as defendants. In the Complaint in the instant action, no corporate directors or officers are named as defendants. There are no John Doe defendants. No individuals are identified, by name or by office, as acting with the requisite scienter.

One might think that would end the scienter inquiry. However, some circuits have approved establishing scienter via so-called "collective scienter."

> [Albeit] it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been *approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (emphasis added); Opposition Brief 36 (quoting *Makor* approvingly). Collective scienter permits finding that a corporation had the requisite scienter if some unnamed corporate officer acted with the requisite scienter. *Accord Southland Secs.*, 365 F.3d at 366. Arguably, this doctrine does not survive the Third Circuit's bar against group pleading in securities cases. *See Winer*

*Family Trust,* 503 F.3d at 335. The bar against group pleading prohibits attributing corporate statements to corporate officers with day-to-day control of corporate activities. But if one cannot impute corporate statements to corporate officers with control, i.e., group pleading, then it seems odd to allow corporate statements to be imputed to unnamed corporate officers and then to impute the officer's scienter to the defendant corporation because the officer had sufficient authority to act for the corporation and had, purportedly, drafted or disseminated the statement in the first instance, i.e., collective scienter.[7]

Assuming without deciding that, in this circuit, a corporate defendant's scienter in a 10b-5 action may be established through "collective scienter," this Court holds, for the reasons explained below, that Plaintiff's allegations fail to "create a strong inference that some corporate officer (or director, employee, or agent) whose intent could be fairly imputed to the corporation acted with requisite scienter." *Dynex,* 531 F.3d at 195.

Plaintiff's position is that Defendants' Public Filings made a series of partial

---

[7] Collective scienter is a doctrine relating to attribution; it permits the scienter of unspecified corporate officers to be imputed to the corporate defendant. However, in *In re Countrywide Fin. Corp. Secs. Litig.,* Civil Action No. 07-05295 (C.D. Cal. 2009), the District Court stated: "Collective scienter refers to a doctrine that allows a strong inference of scienter as to a *corporation,* even though the allegations fail to raise a strong inference as to any *individual* acting on the corporation's behalf." *Id.* at *2 (citing *Glazer Capital Mgmt., LP v. Magistri,* 549 F.3d 736 (9th Cir. 2008)). The *Countrywide* court's expansive view is not supported by *Glazer Capital,* which held: "there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer Capital Mgmt., LP v. Magistri,* 549 F.3d 736, 744 (9th Cir. 2008). In any event, neither the District Court in *Countrywide* nor the Ninth Circuit in *Glazer Capital* approved of any theory of collective scienter, but only discussed collective scienter in dicta.

disclosures or non-disclosures systematically indicating the class A shares were a superior long-term investment, when, in fact, for any investment under $50,000, class A shares would always be outperformed by class B or class C shares or both, without regard to the time horizon of the investment. For example, Plaintiff argues that the Fee Table in the March 1, 2007 Affiliated Fund prospectus presents class A shares as the least expensive. Compl. ¶ 40 & table. Second, the Expense Table in the March 1, 2007 Affiliated Fund prospectus presents class A shares as having the lowest expenses over 10 years. Compl. ¶ 41 & table. Third, the Financial Highlights Table of the April 1, 2007 prospectus for the Balanced Strategy Fund presents class A shares as outperforming class B and class C shares for each year of a five year period between 2002 and 2006 inclusive. Compl. ¶¶ 43-44. Finally, Plaintiff alleges that "while the prospectuses state that the returns do not consider the applicable sales load, these tables are utterly useless without accounting for the relevant loads or providing necessary, important context.

> [D]efendants placed in the prospectus a table identifying the projected expenses and historical returns associated with different classes of mutual funds. *Id.* ¶¶ 41, 44. To obtain the values included in these tables, defendants necessarily ran projections and computations that would have shown asset values and the impact of sales loads on class A shares in amounts under $50,000. *Thus, defendants had to have known that, for investments under $50,000, class A shares are never the best or preferable investment – a material fact that they failed to disclose to investors. Id.* ¶¶ 4, 21.

Opposition Brief at 30 (emphasis added). The thrust of Plaintiff's position is that the various funds were Defendants' core product, a product designed by Defendants. *Id.* Management "knew precisely how the product performed with respect to each class of shares," *id.,* and

therefore, "the Complaint sets forth ample allegations giving rise to the strong inference that defendants consciously disseminated misleading statements regarding a core Lord Abbett product." *Id.* at 32.

*The Fee Table.* Plaintiff quotes the Fee Table (in the March 1, 2007 prospectus for the Lord Abbett Affiliated Fund) as stating[8]:

|  | Class A | Class B | Class C |
|---|---|---|---|
| .... | | | |
| Total Annual Fund Operating Expenses | 0.82% | 1.47% | 1.47% |

Had the Fee Table said this, and no more, arguably, it would have omitted material information. Rather, the Fee Table stated[9]:

|  | Class A | Class B | Class C |
|---|---|---|---|
| Maximum Sales Charge on Purchases | 5.75%[2] | none | none |
| .... | | | |
| Total [Annual Fund] Operating Expenses | 0.82% | 1.47% | 1.47% |

[2] You may be able reduce or eliminate the sale charge. See "Your Investment – Purchases."

Nothing here is false. Nor could the 5.75% sales charge be incorporated into the same line as the "Total [Annual Fund] Operating Expenses" line entry because sales charges are not *annual* expenses (and because they use a different base for calculations: percentage of offering price versus percentage of average net assets). The 5.75% sales charge is not buried on another page or squirreled away in a difficult to read footnote, but appears on the same

---

[8] Compl. ¶ 40.

[9] Compl. Ex. 2 (footnotes, parentheticals, underscores, and marginalia omitted), (Doc. No. 1-2 at 54).

page, in the same font, and directly *above* the operating expenses. Plaintiff characterizes the Fee Table as going to "great lengths to showcase how class A shares were the least expensive share class for long-term investments." Opposition Brief 4. But that characterization is not borne out by the Fee Table, which accurately reports (among other things) one-time charges, expenses, and fees. The Fee Table does not distinguish the long-term from the short-term investor, nor does it distinguish investors in terms of the amount invested.

The gravamen of Plaintiff's claim in regard to the Fee Table is that even though the Fee Table accurately reports the information presented, it failed to report and "*defendants had to have known that*, for investments under $50,000, class A shares are never the best or preferable investment." Opposition Brief 30 (emphasis added). For the reasons explained below, such a claim is insufficient (even in conjunction with the other factual allegations appearing in the Complaint) to establish scienter under *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (emphasis added); *see also* Opposition Brief 36 (quoting *Makor*'s scienter standard approvingly). There are several reasons for this. First, a reasonable investor would realize that although he might save some 0.65%,[10] i.e., 1.47% - 0.82%, in annual fees by choosing class A shares over either class B or C shares, that savings, a mere 0.65%, might in any number of circumstances be dominated by the

---

[10] The percentage here is expressed in percent of average net assets. *Compare infra* note 11.

whopping 5.75%[11] up front sales charge. If this sales charge, which only applies to the class A shares, does not put investors on notice that class A shares might be systematically outperformed by class B and class C shares what would? In other words, a fair reading of footnote two within the Fee Table was to put would-be purchasers on notice that class A shares would in certain, but not all, circumstances (i.e., those investing less than $50,000) be hit by the full 5.75% fee, thereby making class A shares less desirable than otherwise. In the Court's view, this is *not* an omission; this *is* disclosure.

Second, even assuming the Court's characterization wrong, and Plaintiff's characterization right, that is, the Fee Table and the 2007 prospectus as a whole misleadingly omits information that investments in an amount under $50,000 in class A shares will always be outperformed by class B or C shares, that allegedly misleading omission does not give rise to "a strong inference that the defendant [or defendants] acted with the required state of mind." *Avaya, Inc.*, 564 F.3d at 253. As Defendants' argue, the Fee Table adheres to the United States Securities and Exchange Commissions' (the "Commission") Form N-1A model[12] for registration statements. Opening Brief 22. Plaintiff makes no response to this

---

[11] The percentage here is expressed in percent of the offering price. *Compare supra* note 10.

[12] *See generally In re Morgan Stanley Info. Fund Secs. Litig.*, --- F.3d ----, 2010 WL 252294, at *2 n.2 (2d Cir. Jan. 25, 2010) ("The SEC created Form N-1A to facilitate registration by certain types of open-ended management investment companies under the Securities Act and the Investment Companies Act of 1940, 15 U.S.C. § 80a-1 *et seq. See* SEC, Registration Form Used by Open-Ended Management Investment Companies; Guidelines ('Form N-1A Adopting Release'), Securities Act Release No. 33-6479, Investment Company Act Release No. 13,436, 48 Fed. Reg. 37,928, 37,929 (Aug. 22,

point. It is quite possible that those who compiled the prospectus actively sought to comply with the model provided by the Commission and believed that such compliance, *and no more*, was not only what was required, but prudent, because any additional information not specifically called for might be mistaken and itself give rise to a lawsuit under the securities laws. That story seems, to this Court at least, far more compelling than Plaintiff's tale that Defendants sought to trick would-be investors to invest in class A shares by showcasing annual operating fees that were sixty-five hundredths of 1% lower for class A shares than class B or class C shares, while in the very same table also indicating that *only* class A shares paid a 5.75% sales charge.

Third, and more importantly, even if the Court credits Plaintiff's assertion: "Defendants had to have known that, for investments under $50,000, class A shares are never the best or preferable investment," it does not follow that the corporate officers who knew this information were connected with drafting or disseminating this prospectus. It is not enough that some corporate officer, somewhere in the corporate chain knew that investors investing less than $50,000 in class A shares would always be outperformed by otherwise similarly situated investors in class B or class C shares; rather, in order to establish scienter, Plaintiff must allege that that knowledge was known to those who drafted or disseminated the prospectus' Fee Table. *See Southland Secs. Corp.*, 365 F.3d at 366. The corporate officers, including lawyers and accountants, who drafted and disseminated the Fee Table and

---

1983).").

21

other tables might have scrupulously adhered to the Commission's forms while being entirely unaware of the internal projections and calculations that may have revealed (if those calculations were, in fact, generated) that investors investing less than $50,000 in class A shares would be systematically outperformed by those investing in class B or class C shares. Plaintiff seeks to establish the link by arguing that the alleged omissions involve the Defendants' core product. Opposition Brief 30, 36. On these facts, that argument is not persuasive. The fact that investments and the terms of investments were, arguably, the Defendants' core products does not lead to an inference, much less a strong inference, by itself or collectively with the other allegations in the Complaint, that a regularly issued prospectus was actively monitored by those corporate officers who knew (assuming, in fact, that any corporate officers knew) that those investing under $50,000 in class A shares would be outperformed by those investing in class B or class C shares. As the Seventh Circuit explained, an inference of scienter by a corporate entity is permitted via collective scienter when the named or unnamed individuals, themselves corporate officers, who disseminated the alleged fraud do so in the context of a "dramatic ... announcement," and gave as an example General Motors inflating its sales numbers from zero to one million, i.e., six orders of magnitude. *See Makor Issues & Rights*, 513 F.3d at 710; *see also Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (discussing collective scienter in the context of "dramatically false" public statements); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 423 (5th Cir. 2001) (finding scienter sufficiently alleged in the context of a one-product

company where the disclosure was clearly false, as opposed to misleading based on omission). Here the announcement is not dramatic, it is mundane, and the difference between annual fees of 0.82% and 1.47% does not amount to even one order of magnitude, much less six orders of magnitude. Assuming, without deciding that collective scienter is permissible in this circuit in the corporate context post-*Winer Family Trust, supra*, the Court finds that the allegations relating to the Fee Table do not establish or tend to establish the requisite scienter by themselves or in conjunction with the other allegations in the Complaint.

*The Expense Table.* Plaintiff quotes the Expense Table (also in the March 1, 2007 prospectus for the Lord Abbett Affiliated Fund) as stating[13]:

|  | 1-Year | 3-Years | 5-Years | 10-Years |
|---|---|---|---|---|
| Class A Shares | $654 | $822 | $1,004 | $1,530 |
| Class B Shares | $650 | $765 | $1,003 | $1,581 |
| Class C Shares | $250 | $465 | $803 | $1,757 |

According to the Expense Table, class A shares have lower expenses that do class B or class C shares after 10 years, but for a period of 1 year, 3 years, or 5 years, class B and class C shares have lower expenses.[14] An investor whose time horizon is one of the three

---

[13] Compl. ¶ 41. *See also* Compl. Ex. 2 (underscores omitted), (Doc. No. 1-2 at 55). The table assumes, among other things, a 5% return each year and redemption of all shares at the end of the stated term.

[14] Plaintiff's Complaint asserts that the Expense Table indicates that class A shares "impose lower total costs than class B shares after five ... year holding periods." Compl. ¶ 42. This is puzzling. The table indicates that class A shares have higher costs (in fact, $1 higher) than class B shares after five years. The fact that Plaintiff is confused on this point is just another indication how mundane, rather than dramatic, this disclosure is.

shorter periods could not be misled into believing that class A shares have lower expenses that class B or class C shares. Plaintiff argues that investors with a 10 year horizon will be misled to invest in class A shares, misled by the lower expenses, notwithstanding that class A shares are always outperformed by class B or class C shares if the investor invests less than $50,000. The Court rejects Plaintiff's argument in regard to the Expense Table for basically the same reasons it rejected the similar claims surrounding the Fee table. Plaintiff points to no error in this disclosure. Defendants asserts, and Plaintiff does not contradict, that this disclosure adhered to a Commission form. And, finally, the fact that one subset of investors – class A investors investing less than $50,000 and planning to invest for ten years – may have been misled by the lower expenses reported in the Expense Table notwithstanding that their investments would always be outperformed by class B or class C shares does not establish or tend to establish (alone or in conjunction with the other allegations of the Complaint) the requisite scienter. There are several reasons for this. First, there is no reason to believe that the persons who drafted or disseminated the Expense Table – and it is not contested that the table's calculations are correct and in conformity with the Commission's form – were those corporate officers who were aware (assuming any such corporate officers were aware) that the limited subset of investors described by Plaintiff would always see their investment outperformed by those investing in the other classes. Second, the difference in expenses reported here for the 10 year holding period ($1,757, and $1,581, and $1,530) are not dramatic individually or dramatically different when compared against one another. The

differences do not amount to even one order of magnitude. Finally, if the goal of this purported fraud were to encourage the unsophisticated to invest in class A shares, there was no reason to target only those investing for 10 years or more. According to Plaintiff, Defendants made *"far higher"* profits from sales of class A shares than from sales of class B or class C shares. Compl. ¶ 33. If that were the case, then Defendants should have structured their product so that the Expense Table indicated that class A shares had lower expenses for all relevant periods. This could have been accomplished by reducing such expenses by as little as $5 for 1 year, $58 for 3 years, and $2 for 5 years – which, if done, would have (under Plaintiff's theory of its case) reaped "far higher" profits for Defendants. The fact that the Expense Table does not systematically indicate that class A shares had the lowest expenses across all reported periods indicates that there was no fraud here at all and that the table does not establish or tend to establish a strong inference that the Defendants, or its directors, employees, and agents acted with the required state of mind.

　　*The Financial Highlights Table.* Plaintiff quotes the Financial Highlights Table (from the April 1, 2007 prospectus for the Lord Abbett Balanced Strategy Fund) as stating[15]:

|                | 2006  | 2005 | 2004  | 2003  | 2002  |
|----------------|-------|------|-------|-------|-------|
| Class A Shares | 12.12 | 4.12 | 12.29 | 15.19 | -6.76 |
| Class B Shares | 11.42 | 3.49 | 11.64 | 14.40 | -7.32 |
| Class C Shares | 11.46 | 3.43 | 11.68 | 14.39 | -7.33 |

---

[15] Compl. ¶¶ 43-44. Plaintiff's Complaint attaches no exhibit providing a copy of this table from the April 1, 2007 prospectus. Defendants do not contest the accuracy of Plaintiff's reproduction of their prospectus.

Here, class A shares as outperform class B and class C shares for each year of a five year period between 2002 and 2006 inclusive. In each reported year, the class A shares beat the next best share by as little as 0.56% (in 2002) and by as much as 0.79% in 2003. Compl. ¶¶ 43-44. These claims are not "dramatic" and, therefore, they do not tend to establish scienter. Here too, Defendants argue that their table followed a Commission Form. Plaintiff does not rebut this argument. Plaintiffs acknowledge that the table disclosed that it did incorporate the effects of "sales loads." Compl. ¶ 45. Yet, Plaintiff argues that the failure to do so made the table "useless" and implied that it was misleading by omission. *Id*. Defendants argue, and Plaintiff fails to rebut, that the form of the table and its failure to include sales load into the calculations was an effort to comply with express Commission guidance in regard to such disclosures. *See* Securities and Exchange Commission Form N-1A, Item 8, Instr. 3(b). Compliance does not lead to an inference of fraud. Plaintiff also argues that this backward looking table, with a 5 year horizon, fails to take into account the conversion of class B shares into class A shares after 8 years. However, Plaintiff provides the Court with no examples of how Plaintiffs could have produced a better designed table, included the omitted conversion, and have remained consistent with Form N-1A. It is certainly not clear to the Court how a 5 year table should best reflect a conversion after 8 years.

*Other Allegations As To Scienter.*[16] The Complaint alleges that at the time of the alleged wrongful disclosure, the regulatory environment closely scrutinized sales of class B shares. Plaintiff alleges that this gave Defendants an incentive to push class A shares in order "to fly under [the regulator's] radar." Opposition Brief 35. Even if true, this allegation is too vague to be useful. The Commission and state regulators have long regulated entities such as the Defendants. The particular scrutiny supplied by the Commission in regard to one class of investments does not convert Defendants' lawful conduct into wrongful conduct. Nor does the absence of Commission enforcement convert wrongful conduct into lawful conduct. Moreover, even if Plaintiffs sought to escape the burdens of government scrutiny by "pushing" the less monitored share type or product, that does not give rise to an inference, much less a strong inference, that Defendants would engage in unlawful conduct when seeking to participate in less monitored activities. There are legal means to escape government scrutiny – one such way is to consistently refrain from breaking the law. An entity that consistently obeys the law – even if it does so to avoid monitoring – should not be, in effect, punished or put through the costs of discovery for behaving within the requirements of the law.

Plaintiffs also argue that scienter could be inferred because Defendants knew that

---

[16] This opinion primarily discusses those allegations in the Complaint put forward in Plaintiff's Opposition Brief as supporting an inference of scienter. Allegations in the Complaint from which one might infer scienter, but not otherwise briefed by Plaintiff, are not discussed in this opinion. Having read the Complaint, the Court is satisfied that those further allegations do not establish scienter. *See* Opposition Brief 31-37.

would-be investors do not actually hold their investments for the long term. Opposition Brief 32. This argument seems both inconclusive and inconsistent with the allegations of the Complaint. In the Complaint, Plaintiff argued that class A shares in an amount under $50,000 were always outperformed by class B or class C shares *without respect to the number of years held*. Compl. ¶ 21. Plaintiff's position is neither cogent, nor compelling. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).* In the Court's view, it does not tend to establish scienter.

Finally, Plaintiff argues that an inference of scienter can be drawn from the fact that Defendants' Public Filings failed to expressly disclose that broker/dealers were paid more to sell class A shares than class B or class C shares and that they should have done so because class A shares were more profitable. Plaintiff argues that the omission in regard to broker/dealer commissions would have revealed a significant conflict of interest. In other words, had would-be investors been made aware of the conflict, in all likelihood, investors would not have bought as many (or any) class A shares, and Defendants' profitability would have declined. Here, the Court addresses only scienter, not materiality. Defendants correctly respond that Plaintiff's position is essentially a motive and opportunity allegation. As the Third Circuit has repeatedly explained: "[M]otives that are generally possessed by most corporate directors and officers [i.e., to increase corporate profitability] do not suffice [to establish a strong inference of scienter]; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Avaya*, 564 F.3d at

28

278. Here the alleged fraud may have benefitted the Defendant entities, but there are no allegations that corporate directors or officers would have personally benefitted in any meaningful way from the alleged fraud. The holding of *Avaya* cannot be undercut by formalistic or bare bones pleading, i.e., pleading an entity or entities as the exclusive defendant or defendants, rather than specific and detailed pleading in regard to named or unnamed corporate directors and officers responsible for the alleged fraud. In essence, Plaintiff is asking the Court to reward it for pleading less, not more. *See generally* Public Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.*

In short, the Court concludes that not one of the factual allegations of the Complaint alone or collectively supports a strong inference of scienter.

C.     Materiality

Having disposed of this matter on grounds relating to scienter, the Court does not reach Defendants' remaining arguments relating to materiality.[17] *See generally Benzon v. Morgan Stanley Distribs., Inc.,* 420 F.3d 598 (6th Cir. 2005); *Ulferts v. Franklin Resources, Inc.,* 554 F. Supp. 2d 568 (D.N.J. 2008), *reconsideration denied,* 567 F. Supp. 2d 678 (D.N.J. 2008). Moreover, as explained below, the Court will permit Plaintiff to file an amended complaint.[18] Should Plaintiff file an amended complaint with factual allegations supporting

_____

[17] *See* Opening Brief Parts I[A], I[B][1], I[B][2], II, at 15-27.

[18] Defendants make no substantial argument against Plaintiff's request for an opportunity to replead. *See Conroy v. Leone,* 316 Fed. Appx. 140, 144 n. 5 (3d Cir. Mar. 9, 2009) ("We find this undeveloped argument has been waived."); *Clay v. Holy Cross Hosp.,* 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (holding that perfunctory and undeveloped

a strong inference of scienter, the Court will be better positioned to address the materiality of the allegations of the newly filed complaint.


V.      **CONCLUSION**

For the reasons elaborated above, the Court **GRANTS** in part, and **DENIES** in part, Defendants' motion to dismiss. Specifically, the Court will grant the Motion to Dismiss thirty days from the entry of the order filed contemporaneously with this opinion, unless Plaintiff files a motion to amend the Complaint, with a draft amended complaint, complying with federal and local rules, and making scienter allegations consistent with this opinion.

An appropriate order accompanies this memorandum opinion.

_____
WILLIAM J. MARTINI, U.S.D.J.

DATE: February 23, 2010

---

arguments, and arguments unsupported by pertinent authority, are waived). Defendants cite to one case: *Fletcher-Harlee v. Pote Concrete Contractors*, 482 F.3d 247, 252 (3d Cir. 2007). Reply 2 (citing *Fletcher-Harlee*, *supra*). *Fletcher-Harlee* discusses whether it is error for a district court to fail to offer a plaintiff an opportunity to amend *sua sponte*, i.e., where no request to amend was made to the trial court. Here Plaintiff has requested an opportunity to amend. Should Plaintiff avail herself of it, the motion will be adjudicated in light of Federal Rule of Civil Procedure 15 and Local Rule 7.1. But the Court will not prejudge the issue, and Defendants will, of course, have an opportunity to oppose Plaintiff's motion.